# United States Court of Appeals
## For the First Circuit

No. 03-2719

UNITED STATES,

Appellee,

v.

FERNANDO GÓMEZ-ROSARIO,

Appellant, Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]
[Hon. George Z. Singal, U.S. District Judge]

Before

Lynch, Circuit Judge,
Baldock,* Senior Circuit Judge,
and Lipez, Circuit Judge.

Andrew Nathanson, with whom Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C. was on brief, for appellant.
German A. Reickehoff, Assistant United States Attorney, with whom H.S. Garcia, United States Attorney, and Nelson Pérez-Sosa, Assistant United States Attorney, were on brief, for appellee.

August 12, 2005

_____
* Of the Tenth Circuit, sitting by designation.

**LIPEZ**, **Circuit Judge**.  Following a jury trial, defendant Fernando Gómez-Rosario ("Gómez") was acquitted of conspiring to import heroin, see 21 U.S.C. §§ 952(a), 963, but convicted of conspiring to possess heroin, see 21 U.S.C. §§ 841(a)(1), 846.  The district court[1] violated his Sixth Amendment rights by denying his request to proceed pro se, (2) that the court's instructions to the jury constructively amended the indictment in violation of the Fifth Amendment, (3) that there was insufficient evidence to support his conviction, (4) that the delay between his arrest and the filing of the superseding indictment violated his constitutional rights, and (5) that he should be resentenced in light of United States v. Booker.  Although the first claim poses important questions regarding the right of self-representation and the appointment of standby counsel, we ultimately conclude that

---

[1]We refer throughout this opinion to "the district court," a generic term which might suggest that a single judge presided over all the proceedings that culminated in this appeal.  That is not the case.  At least three different district court judges, and an array of magistrate judges, have been involved in different stages of this case.  Judge Domínguez handled the October 2001 and March 2003 motions to proceed pro se that are discussed in Section II.A., while Judge McAuliffe presided over the first trial, which ended in a judgment of acquittal on two counts and a mistrial on one count, and Judge Singal presided over the second trial, which resulted in Gómez's conviction for conspiracy to possess drugs with intent to distribute.  Only rulings of Judge Domínguez and Judge Singal are at issue in this appeal.

Gómez's right to conduct his own defense was not violated in this case. The second, third and fourth claims are also without merit. Concluding that Booker error was present here, however, we remand for resentencing.

**I.**

We turn to the trial record for the following background, presenting the facts in the light most favorable to the verdict. See Baron v. Suffolk County Sheriff's Dep't, 402 F.3d 225, 229 (1st Cir. 2005).

**A.      The heroin transaction**

On April 21, 2000, customs agents intercepted Eugene Sarruco at the airport in Carolina, Puerto Rico following his arrival on a flight from Curacao. Suspecting that Sarruco was a drug courier, the agents took him to the airport's medical facility where he was arrested after passing five pellets of heroin, each containing slightly less than eight grams of heroin.

Sarruco told agents that he had ingested eighty-five heroin pellets[2] and carried them to Puerto Rico on behalf of a drug dealer in Curacao named Andrés Hueck. Upon his arrival in Puerto Rico, Sarruco was under instructions to go to the Hotel San Jorge or the Hotel Iberia. The buyer -- whose identity Sarruco did not

---

[2]Sarruco expelled the remaining eighty pellets at the San Juan Health Center under the supervision of two customs agents. In total, he carried approximately 678 grams of heroin.

know -- would meet him at the hotel with a bottle of laxatives and pick up the heroin in exchange for $7,000.

With Sarruco's cooperation, the agents set up a "controlled delivery" of the heroin pellets. They had Sarruco call Hueck with a message that he was in Room 209 at the Hotel Iberia. Hueck told Sarruco that someone would be coming, presumably to pick up the heroin. Agent Luis Carmona, who was enlisted to act undercover as Sarruco's stand-in, took the five pellets that Sarruco had expelled to Room 209 of the Hotel Iberia. Agent Carmona put one of the pellets in a drawer in the night stand and put the other four pellets, wrapped in toilet paper, in a dresser drawer. Other agents set up audio and video surveillance of Rooms 209 and 210, as well as surveillance outside the hotel.

Sometime after 4 p.m. on April 21, 2000, Gómez drove up to the Hotel Iberia in a green Ford Windstar. He parked the van, leaving two passengers inside, and went into the hotel. A Datsun parked in front of the van, and its driver also went inside the hotel. When the Datsun's driver returned, two agents detained him for questioning until a third agent exited the hotel, yelling that they had the wrong person and that the man in the room was the driver of the green van. One of the passengers in the van jumped into the front seat and drove away. The agents pursued the van to a dead end street, where the van's passengers fled on foot. Upon searching the van, the agents found a loaded gun in plain view

between the front seats. They also seized a rental agreement listing Fernando Gómez as an "additional renter."

In the meantime, Gómez arrived at Room 209 of the hotel, where Agent Carmona was waiting pursuant to the instructions that Hueck had given Sarruco. Carmona, posing as Sarruco, invited Gómez inside and gave him the four pellets wrapped in toilet paper. When Gómez asked Carmona how many he had swallowed, he responded eighty-five. Carmona told Gómez that he was having trouble expelling the remaining pellets. Gómez told him that he needed a laxative and offered to get him one. Gómez then placed the pellets back in the dresser drawer. Carmona went into the bathroom, ostensibly because he was having stomach cramps. Another agent, who had been hiding in the closet, then came out and arrested Gómez.

## B.      Legal proceedings

### 1. First indictment

On May 3, 2000, a grand jury returned a three-count indictment against Gómez and Sarruco. Count One charged them with aiding and abetting the importation of approximately 975 grams of heroin into the United States in violation of 21 U.S.C. §§ 952(a) and 963. Count Two charged the defendants with aiding and abetting the unlawful possession with intent to distribute approximately 975 grams of heroin in violation of 21 U.S.C. § 841(a)(1). Count Three charged Gómez with possessing a firearm in furtherance of a drug

-5-

crime (specifically, possession of heroin with intent to distribute) in violation of 18 U.S.C. § 924(c)(1)(A).

Gómez went to trial on February 19, 2003.[3] The government presented several witnesses, including Sarruco and Agent Carmona, and played the audio and video surveillance tapes of Gómez's interaction with Agent Carmona. Gómez rested without presenting any evidence. At the close of evidence, he moved for a judgment of acquittal on all counts. The district court granted the motion as to Counts Two (possession of heroin with intent to distribute) and Three (possession of a firearm). With respect to Count Two, the court reasoned that Gómez did not exercise dominion and control over the drugs when he briefly inspected them in the hotel room, nor had he aided and abetted Sarruco's possession of drugs because the two did not have a prior relationship. Because Count Three alleged possession of a gun in furtherance of the crime of drug possession, it necessarily turned on Count Two. Count One (importation) went to the jury, which could not agree on a verdict. The court declared a mistrial and ordered the case to be reset for trial.

2. Superseding indictment

Instead of retrying Gómez on the importation count, the government obtained a two-count superseding indictment on March 12, 2003. Count One charged Gómez with conspiring to import into the

_____
[3] Sarruco pled guilty before the trial.

United States approximately 975 grams of heroin in violation of 21 U.S.C. §§ 952(a) and 963.  Count Two charged Gómez with conspiring to possess with intent to distribute approximately 975 grams of heroin in violation of 21 U.S.C. §§ 841(a) and 846.

The charges in the superseding indictment were tried before a jury in June 2003.  The government presented substantially the same evidence that it had offered during the first trial.  The defense presented two witnesses, Gómez and his mother, neither of whom had testified at the first trial.  Gómez testified to an alternative version of events on the afternoon of his arrest.  According to his testimony, he went to the Hotel Iberia on April 21 to visit a woman named Bonnie whom he met the previous night while out with friends.  He knocked on the door of Room 209 believing that it was Bonnie's room, and was surprised when a male (Agent Carmona, posing as Sarruco) emerged from the room.  As soon as Gómez entered the room, the man told him that he was not feeling well and began to rub his stomach.  Gómez asked the man if he was all right.  The man responded that he needed something to help him "evacuate," and Gómez asked if he meant a laxative.  The man then handed Gómez a package (the four heroin pellets wrapped in toilet paper), which Gómez put down without looking at its contents.[4]

_____

[4]Gómez's testimony on this point is inconsistent with the account offered by Agent Carmona, who testified that Gómez looked through an open end of the package before putting it down and then asked how many he had swallowed.  Based on such inconsistencies, the court found at sentencing that "the defendant . . . perjure[d]

-7-

After saying that he had been in pain for several hours, the man excused himself to use the restroom and Gómez was arrested. Gómez's mother testified regarding her relationship with Gómez and her contact with him in the week leading up to his arrest.

After approximately seven hours of deliberations, the jury found that Gómez was not guilty as to Count One (conspiracy to import) but guilty as to Count Two (conspiracy to possess with intent to distribute). In response to a question on the jury verdict form, the jury decided that the amount of heroin involved was less than 100 grams.

On November 4, 2003, the district court sentenced Gómez to 121 months in prison, the bottom of the applicable guidelines range, and three years of supervised release.

**II.**

**A.      Request for Self-Representation**

It is well-settled that the Sixth Amendment encompasses a right to self-representation by criminal defendants. See Faretta v. California, 422 U.S. 806, 814-17 (1975). A criminal defendant has the right to "conduct his own defense, provided only that he knowingly and intelligently forgoes his right to counsel and that he is able and willing to abide by rules of procedure and courtroom protocol." McKaskle v. Wiggins, 465 U.S. 168, 173 (1984).

---

himself during trial when he was claiming that he was at the hotel to find this unknown female in an unknown room. I find that in fact he went to the hotel to pick up the drugs."

1. <u>History</u>

To set Gómez's Sixth Amendment claims in context, we begin by reviewing the history of his representation in this case.

By April 2002, some two years after he was arrested and nine months before his first trial, Gómez -- though represented by counsel -- had already filed more than two dozen <u>pro</u> <u>se</u> motions, many of them long, confusing, contradictory, and devoid of merit. Denied bail early on, he nonetheless continued to seek release on bail. He sought mandamus against the government several times. A number of motions repeatedly sought dismissal of the indictment on fanciful theories or claims of misconduct. One, for example, was captioned "Motion to dismiss the indictment based on some or all the violation committed by the government against federal and state laws and defendants constitutional rights or for appeal." Other motions asked the court to explain why it had denied earlier motions or to reconsider the denials and rule in his favor. He thus filed repetitive motions on subjects already ruled on.

Further, some of Gómez's filings were not motions in the proper sense, but instead rants directed at the district court and attorneys for both sides. On July 31, 2001, for example, Gómez submitted a motion entitled "Motion to set time and place for the trial," in which he argued that his trial should be held in Florida "due to all the complecety and friendship that there is between attornney and U.S. Attorneys" and because "it is the law that the

personal wishes or convenience of the judge are not factor to be considered in determining the proper place of trial."  And on August 29, 2001, Gómez filed a motion entitled "Pro-se motion claiming duprocess violation by the court by dismissing defendant's pro-se motion under not justifiable grond, after the defendant being wheting way over two month for this honorable court to rules up on those motion."

On April 12, 2002, Gómez asked the court to permit his then-counsel Bruce McGiverin to withdraw so that he could proceed pro se.  The court agreed, but in order to minimize pro se motions that were so incomprehensible as to be a "total waste of time" for the court, the court appointed McGiverin as standby counsel and told him to read Gómez's pro se motions, "advis[e] the court what motions you as a professional would adopt," and offer Gómez drafting advice.  The court stated that regardless of McGiverin's opinions, Gómez would be free to file the motions, which would then be filtered by a magistrate judge.

After the April 12, 2002 order, Gómez filed several dozen more pro se motions, including many after he retained a new counsel of record, Linda George, and despite the fact that his various counsel had filed all of the customary discovery and other motions. These new pro se motions were confusing and many were meritless. On May 14, 2003, for example, Gómez filed an eight-page, single-spaced motion, accompanied by a four-page affidavit, asking that

the case be dismissed for "double jeopardy" (of which there was none).  The motion stated that "even knowing" that Gómez's affidavit was based on government perjury, "the District Court . . . has desregarded and/or ignored the matter by not holding a hearing as to the issue."

We quote such passages not to make light of Gómez's motions, but to emphasize the difficulties they created for the district court.  The court received dozens of such filings over a three-year period, many of them quite long and packed with muddled, contradictory, meritless legal argument.  Each needed a response from the court, and many led to hearings, not to mention appearances by counsel and replies from the government.  Despite the burden Gómez's pro se motions imposed, the district court did not treat them lightly.  It ruled on many of them, denying the vast majority but allowing some.  Most of those it found to have merit had to do with Gómez's various requests for dismissal of his lawyers, for extensions of time, and for transcripts of previous hearings.

By May 2003, the defense had filed more than 95 motions, the majority of which were pro se.  One such pro se motion, which Gómez filed on March 28, 2003, sought the withdrawal of his then-counsel George.  The court held a hearing on Gómez's motion on May

22, 2003.[5] The court first informed Gómez that it would not allow George to withdraw and to be replaced by a court-appointed attorney because Gómez had not offered a valid reason for his dissatisfaction with George.

George suggested that Gómez proceed pro se while she acted as standby counsel. The court initially rejected that proposal, noting that it had made a similar arrangement with McGiverin but that "there were a considerable [number] of motions that were filed that were either thoroughly out of bounds or were simply not indicated for this type of case. So therefore, I have to stop him. There is a moment when the court has to stop receiving all those motions." After several more exchanges, the court agreed to allow Gómez to proceed pro se with George acting as standby counsel. The court explained the duties it assigned to George, now acting as standby counsel:

> Court: [T]he first thing I have to ask you is to examine all the motions that he's filed [pro se], and to see which ones you're going to adopt. And then adopt them . . . by doing a refiling. The court . . . will not

---

[5]Gómez cites the two-month interval between the filing of his motion and the hearing as evidence of the district court's "indifference to the defendant's assertion of an absolute Sixth Amendment right." This claim is manifestly unfair to the district court, which expended a great deal of effort in attempting to accommodate Gómez. Moreover, there was good reason for the delay. Shortly after Gómez filed his motion, the district court judge temporarily recused himself from the case and reassigned all pending motions to a magistrate judge. The magistrate promptly issued an order giving George an opportunity to respond to the motion to withdraw, and scheduled the hearing a month later, by which point the district court judge had returned to the case.

authorize his participation pro se unless you do a screening of the motions.
George: I will, Your Honor. I'll go over every one.
Court: That's the only way I'm going to permit it. Pro se is out of the question. It's out of the question because you cannot handle what is appropriate. You don't know enough law, what is appropriate for a case. And you keep filing motions that are totally out of bounds with the facts and with the law. . . . I'm not going to have the U.S. Attorney answer some of these motions that I understand are totally out of bounds.
George: I will review those and I'll refile them.
Court: Refile those that you understand, that you . . . as a member of the court deem to be applicable to this case. And I urge that you use your discretion as a lawyer and your reputation as a lawyer before this court. That's all I have to say. I feel totally at ease if you do that.
George: Okay.
Court: All right. And that's the only way I'm going to allow you to represent yourself in this case. That's it.
Gómez: Your Honor, if that's what you want, I mean --
Court: It's not what I want. This is what the court must do, considering the history of motions that have been filed in this case.
Gómez: Your Honor, but the thing is most have been filed because they need to be filed. Any of the motions --
Court: As long as they are reviewed by counsel, I have no problems.

The court thus allowed Gómez to proceed pro se but imposed the condition that George review motions written by Gómez and refuse to file those that were, in the court's words, "totally out of bounds with the facts and with the law."

Following the May 22 hearing, Gómez participated fully in jury selection. Trial then began before a different district court judge. Before the jury was sworn in on the trial's first day, there was some confusion as to Gómez's status. The judge indicated that he thought Gómez was proceeding with counsel. However, Gómez

-13-

and George quickly clarified that the May 22 order allowed Gómez to represent himself. Gómez told the court, and George verified, that "I was supposed to be represented by myself, pro se." He went on to explain that "Mr. Domínguez, the judge . . . addressed the matter and he decided for me to be represented by myself with Linda George as helping counsel. I was permitted to address the court." After hearing this, the judge questioned Gómez to confirm that he had knowingly and voluntarily waived the right to counsel.[6] The judge then agreed that Gómez could represent himself, and noted that George was standby counsel "in the event that [Gómez] ha[s] questions or any information [he] need[s] from her." When it came time for Gómez to deliver his opening statement, however, Gómez informed the trial judge that he did not have a statement prepared. The judge told Gómez that he could make (or waive) the statement

---

[6]Before concluding that the waiver of the right to counsel was knowing and voluntary, the trial judge took great pains to ensure that Gómez had "a sense of the magnitude of the undertaking," Maynard v. Meachum, 545 F.2d 273, 279 (1st Cir. 1976). For example, the judge warned Gómez:

> I think it is unwise of you to try to represent yourself. You are not familiar with the law in spite of what you think. You are not familiar with court procedure . . . and you are not familiar with the Rules of Evidence in spite of what you think. This is a very serious set of charges. If you represent yourself, you're going to be bound by the result and you can't come back to me later and say, 'Gee, I made a horrible mistake and now, I think I ought to do it all over again with an attorney. I urge you strongly, in the strongest possible terms, because I think you are making a big mistake, not to try to represent yourself.

-14-

himself, retaining his pro se status, or allow George to make the statement, relinquishing his pro se status. Faced with waiving his opening statement, Gómez allowed George to take over his representation.

Although George represented Gómez at trial, Gómez continued to file pro se motions after the trial pursuant to the guidelines set forth in the court's May 22 order, i.e., screening by George. Gómez was also permitted to participate actively in a post-judgment motions hearing on August 27, 2003.[7] As the court explained at the hearing, "[y]ou're authorized to speak to the court. . . . One thing is to speak to the court and another is to be filing motions. Two totally different things." With the court's permission, both Gómez and his counsel participated at his sentencing hearing on November 4, 2003.

2. October 2001 motion to proceed pro se

Gómez first argues that the district court erred in handling his October 2, 2001 motion to remove his then-counsel McGiverin[8] and to proceed pro se. Specifically, Gómez maintains

---

[7]The August 27, 2003 hearing involved another change of counsel. Gómez had filed a civil suit against George, creating a conflict of interest between the two. The court concluded that in light of the conflict of interest, it had to allow George to withdraw. The court again agreed to let Gómez "proceed pro se with standby counsel" subject to a limitation that "standby counsel is the only person authorized to sign motions," and appointed attorney Miriam Ramos Grateroles as the standby counsel.

[8]Gómez claimed that McGiverin would not file motions that Gómez believed were necessary to his defense and to preserve his

-15-

that the court did not comply with its duty to determine whether the motion constituted a valid waiver of his right to counsel and that, instead, the court "effectively ignored the motion, failing to conduct a hearing on it for more than six months" and then rejected the motion "out of hand."

Gómez's account of these proceedings does not square with the record. The court did not "effectively ignore[]" Gómez's motion to proceed pro se. To the contrary, the court scheduled a hearing on the motion for October 15, 2001, two weeks after it had been filed. The hearing had to be rescheduled, however, after the United States marshals informed the court that Gómez was out of control, exhibiting violent behavior and expressing ill will toward his mother and his lawyer. Faced with this information, together with the fact that McGiverin was the fifth attorney that Gómez fired or sought to have removed, the court concluded that it had "no other alternative but to order [Gómez's] psychiatric evaluation immediately." Such an evaluation was entirely appropriate under the circumstances, see Godinez v. Moran, 509 U.S. 389, 400 (1993) (noting that a court must determine that a defendant seeking to waive counsel is competent), and Gómez does not contend otherwise.

The sealed psychiatric examination was filed with the court on February 1, 2002. On February 15, 2002, the court issued a sealed order finding the defendant competent to stand trial. The

appellate rights.

-16-

court subsequently granted a motion by Gómez to discuss his legal representation, scheduling a hearing for April 12, 2002. At the April 12 hearing, the court expressed concern about Gómez's ability to represent himself effectively, noting that he had "fill[ed] this record with totally incoherent motions, which are contradictory and taken totally out of context." Nevertheless, the court granted Gómez's motion to proceed pro se, subject to a requirement that he have standby counsel.[9]

A court may appoint standby counsel even over the defendant's objections. See United States v. Kneeland, 148 F.3d 6, 13 (1st Cir. 1998) (noting that "a trial court may appoint standby counsel against a defendant's wishes"). Thus, the requirement that McGiverin act as standby counsel in this case was not inconsistent with Gómez's pro se status. Cf. United States v. Walsh, 742 F.2d 1006, 1007 (6th Cir. 1984) (per curiam) (holding that standby counsel did not eviscerate the defendant's right to self-representation where the defendant "was required to submit his motions to advisory counsel for review"). Indeed, Gómez represented himself at a bail hearing within days of the court granting his motion for self-representation. Although McGiverin also participated in the bail hearing by delivering a final

_____

[9]Although there was some ambiguity during the hearing as to McGiverin's exact role as standby counsel, the court ultimately explained that it wanted McGiverin to examine Gómez's pro se motions, but that Gómez retained control over their filing.

-17-

argument, he did so only in response to an explicit request by Gómez.[10]

In short, Gómez's claims that the court rejected his October 2, 2001 motion for self-representation "out of hand" and that "[a]t no time did the [district court] allow [him] to represent himself" are flatly incorrect. The court did not err in handling the motion to proceed pro se.

### 2. May 22, 2003 screening order

Gómez next faults the court's handling of his motion to have his counsel -- this time, his sixth attorney, Linda George -- withdraw and to proceed pro se. Emphasizing that Gómez's previous pro se motions had been incomprehensible, the court ruled on May 22, 2003 that Gómez could represent himself only if George filtered and approved his motions before they were filed. On appeal, Gómez asserts that this ruling violated his Sixth Amendment right to self-representation. We disagree.

Gómez first contends that the court's May 22 order denied his request to proceed pro se and therefore violated his Sixth Amendment right of self-representation. See Faretta, 422 U.S. at 807. The record does not support this claim. The court did not deny Gómez's request to proceed pro se. Rather, as we have

---

[10]Gómez employed this hybrid representation arrangement again at a motions hearing on August 15, 2002, representing himself throughout much of the hearing but asking McGiverin, his standby counsel, to cross-examine a witness about an evidentiary issue.

-18-

described, it granted the request but imposed one limitation on Gómez's self-representation -- namely, a requirement that George, as standby counsel, screen Gómez's motions. Gómez was permitted to represent himself in other areas, including at jury selection. As the court explained during a hearing on August 27, 2003, the May 22 order left Gómez free to "speak to the court," just not to "file motions on your own." We therefore reject Gómez's claim that the court denied his request to represent himself "out of hand."

Perhaps anticipating this result, Gómez also asserts that George's unwelcome participation as standby counsel -- i.e., her screening of the motions -- so interfered with his right of self-representation as to "effectively render[] his right to self-representation meaningless." Armant v. Marquez, 772 F.2d 552, 558 (9th Cir. 1985). We consider this claim under the standards set forth in McKaskle v. Wiggins, which dealt with the role that standby counsel, present at trial over the defendant's objections, may play without eviscerating the Faretta right of self-representation. The McKaskle Court identified two criteria as being central to its analysis:

> First, the pro se defendant is entitled to preserve actual control over the case he chooses to present to the jury. . . . If standby counsel's participation over the defendant's objection effectively allows counsel to make or substantially interfere with any significant tactical decisions . . . or to speak instead of the defendant on any matter of importance, the Faretta right is eroded.

> Second, participation by standby counsel without the defendant's consent should not be allowed to destroy the

-19-

jury's perception that the defendant is representing himself.

465 U.S. at 178.

Gómez first asserts that as a result of the court's screening order, he was "unable to submit motions that counsel did not approve of." Because this contention pertains solely to George's participation in Gómez's motions practice, which occurred outside the presence of the jury, only the first prong of the McKaskle analysis is relevant to our inquiry. See id. at 179. ("Participation by standby counsel outside the presence of the jury engages only the first of these two limitations."). Gómez has not demonstrated that his Faretta right was "eroded" according to this standard.

Although it is true that he could not submit a motion without George's approval, Gómez has not identified on appeal any motions that George prevented him from filing. Indeed, the record includes a number of pro se motions that were drafted by Gómez and filed by George after the court's May 22 order. Moreover, George's ability to block Gómez from filing motions that were irrelevant or "totally out of bounds" cannot be said to constitute either interference with a "significant tactical decision" or a preemption of Gómez's ability to speak on a "matter of importance." McKaskle, 465 U.S. at 178. Rather, the court designated George as standby counsel, and defined her role, to "ensure the defendant's compliance with basic rules of courtroom protocol and procedure,"

-20-

a practice that does not infringe on a pro se defendant's Faretta rights. Id. at 183.

Basic rules of courtroom protocol and procedure impose an obligation, both on counsel and on individuals acting as their own counsel, to comply with court rules and not file frivolous motions. Federal courts "possess discretionary powers to regulate the conduct of abusive litigants." Cok v. Family Court of Rhode Island, 985 F.2d 32, 34 (1st Cir. 1993). This power includes the ability to enjoin a party -- even a pro se party -- from filing frivolous and vexatious motions. Sires v. Fair, No. 96-1454, 1997 WL 51408 (1st Cir. Feb. 10, 1997) (unpublished); Castro v. United States, 775 F.2d 399, 408 (1st Cir. 1995) (abrogated on other grounds by Stevens v. Dep't of the Treasury, 500 U.S. 1 (1991)). This court reviews such orders for abuse of discretion. Castro, 775 F.2d at 408. In fact, in a parallel situation, we upheld a district court order which enjoined a pro se litigant "from filing any motions, pleadings or papers . . . without prior leave of the Court," Hart v. United States, No. 92-1801, 1994 WL 89442, at *1 (1st Cir. Mar. 22, 1994), where the defendant had "deluged the court with at least sixty-six different motions, most of them pro se." Id. (quoting United States v. Hart, 933 F.2d 80, 81-82 (1st Cir. 1991)).

Gómez nevertheless maintains that George's screening role was inconsistent with his right of self-representation. His argument relies on the Court's statement in McKaskle that

> Faretta rights [to self-representation] are adequately vindicated in proceedings outside the presence of the jury if the pro se defendant is allowed to address the court freely on his own behalf and if disagreements between counsel and the pro se defendant are resolved in the defendant's favor whenever the matter is one that would normally be left to the discretion of counsel.

McKaskle, 465 U.S. at 179. Gómez asserts that as long as George was screening his motions, he was unable to "address the court freely" and that by allowing George, rather than Gómez, to decide which motions to file, the court failed to resolve disagreements in favor of the defendant, all in contravention of McKaskle.

The statement from McKaskle on which Gómez relies cannot be read in isolation. That statement was a reiteration of the first prong of the test set forth earlier in the opinion, namely the requirement that standby counsel's unwelcome participation not "substantially interfere with any significant tactical decisions" or result in counsel "speak[ing] instead of the defendant on any matter of importance." Id. at 178 (emphasis omitted). This formulation informs the meaning of the reiteration relied upon by Gómez. Moreover, that reiteration must also be read in conjunction with the Court's subsequent statement that there is no "significant interference with the defendant's actual control over the

-22-

presentation of his defense, and thus no infringement of his _Faretta_ rights, when "counsel merely helps to ensure the defendant's compliance with basic rules of courtroom protocol and procedure." _McKaskle_, 465 U.S. at 183. The _McKaskle_ Court also emphasized that "[t]he trial judge may be required to make numerous rulings reconciling the participation of standby counsel with a _pro se_ defendant's objection to that participation; nothing in the nature of the _Faretta_ right suggests that the usual deference to 'judgment calls' on these issues by the trial judge should not obtain here as elsewhere." _Id._ at 177 n.8.

Taken together, these explanations of permissible participation by standby counsel indicate that the _pro se_ defendant's right to "address the court freely" is not absolute. Rather, the court may use standby counsel to facilitate the orderly functioning of the proceedings so long as the defendant retains control over "significant tactical decisions" and "on any matter of importance." George's screening role was consistent with that standard. In light of Gómez's long history in this case of filing irrelevant and frivolous motions, George's responsibility for preventing the filing of such motions did not deprive Gómez of control over his defense. _Cf._ _United States_ v. _Collins_, 920 F.2d 619, 627 (10th Cir. 1990) (noting that "an attorney may be dismissed for pursuing frivolous theories"); _United States_ v. _Masat_, 896 F.2d 88, 92 (5th Cir. 1990) (same); _Model Rules of_

-23-

Prof'l Conduct R. 3.1 (2003) (noting that "[a] lawyer shall not . . . assert . . . an issue . . . unless there is a basis in law and fact for doing so that is not frivolous").

Gómez also asserts that George's unwelcome standby participation violated the limits set forth in McKaskle because it left him unable to call witnesses who would have corroborated a certain aspect of his testimony. Gómez's argument appears to rely on the following logic: the court's May 22 order regarding George's screening role led him to believe that he would not be permitted to proceed pro se at trial; Gómez therefore arrived at trial unprepared to represent himself; although the trial judge agreed to let Gómez proceed pro se, Gómez's lack of preparation forced him to ask George to take over his representation before his opening statement;[11] this relinquishment of his pro se status meant that George, rather than Gómez, chose which witnesses to present. In short, Gómez contends that, but for George's screening role, he would have represented himself at trial and called witnesses that George chose not to call.

It is true that the judge presiding over Gómez's second trial initially was confused as to whether the court's May 22 order

---

[11]As already noted, when it became apparent that Gómez had not prepared an opening statement, the trial judge informed Gómez that he could make (or waive) the statement himself, retaining his pro se status, or allow George to make the statement, relinquishing his pro se status. Faced with waiving his opening statement, Gómez allowed George to take over his representation and to conduct his defense.

restricted Gómez's pro se status only with regard to motions, or with regard to his self-representation more generally. Given Gómez's claim on appeal that he was unprepared because he did not believe he would be allowed to represent himself, however, it is Gómez's understanding of the pre-trial record, rather than the trial judge's understanding, that is relevant. As we have already observed, Gómez told the trial judge that he was "supposed to" represent himself and that the previous district court judge had "decided for me to be represented by myself with Linda George as helping counsel. I was permitted to address the court." These statements indicate that Gómez thought that he had been granted pro se status prior to the trial, undermining his claim that he interpreted the court's May 22 screening order to preclude him from representing himself at trial. Gómez's lack of preparation at the outset of the second trial was his own fault. His decision to relinquish his pro se status as a result of that lack of preparation was entirely voluntary. The claim that George's screening role prevented Gómez from representing himself at trial and calling particular witnesses is therefore without merit.[12]

---

[12]Nor is there merit to Gómez's claim that the court should have granted a continuance on the morning of trial, sua sponte, to give him additional time to prepare, or alternatively, allowed a hybrid representation arrangement under which George could make the opening statement before allowing Gómez to resume his self-representation. See United States v. Betancourt-Arretuche, 933 F.2d 89, 95 (1st Cir. 1991) (discussing both the court's discretion to permit hybrid representation and the relevance of timeliness of requests for pro se representation and/or a continuance).

-25-

**B.      Constructive amendment of the indictment**

Count Two of the superseding indictment charged Gómez with conspiracy to possess with intent to distribute approximately 975 grams of heroin.  At the close of the second trial, the jurors were given a special verdict form that read, in part:

> COUNT II.    CONSPIRACY TO POSSESS WITH INTENT TO DISTRIBUTE HEROIN
>
> 3.   We, the jury, find the defendant Fernando Gómez-Rosario _____ (guilty/not guilty).
>
> 4. (Answer only if you have answered "Guilty" to Question #3.)
>
>> (a) Was the amount of heroin at least 100 grams or more?
>>
>> Yes ___   No ___
>
>> (b) [Answer only if you have answered "no" to Question #4(a).]
>
> Was the amount of heroin less than 100 grams?
>
>> Yes ___   No ___

Gómez did not object to the special verdict form, which presumably was designed to comply with the requirement set forth in Apprendi v. New Jersey, 530 U.S. 466, 490 (2000), that a jury find, beyond a reasonable doubt, any facts needed to impose a sentence in excess of the default statutory maximum.  See United States v. Perez-Ruiz, 353 F.3d 1, 15 (1st Cir. 2003) (applying Apprendi to drug type and quantity determinations), cert denied, 541 U.S. 1005 (2004).[13]

_____

[13]The default statutory maximum for conspiracy to possess with intent to distribute heroin in violation of 21 U.S.C. § 841(a), the crime specified in Count II of the superseding indictment, is

After approximately three hours of deliberations, the jury sent a note asking the court to explain "the importance of 100 grams of heroin when the defendant is guilty or not guilty." The court asked counsel for a suggested response. Gómez's counsel responded that "I think the court should just read what was on the verdict sheet again. I don't think we should get into any explanation." The court substantially complied with this suggestion, instructing the jury that "under the law, on a finding of guilty, the jury is required to answer the question regarding quantity. On a finding of not guilty, the jury should not answer the question regarding quantity." The jury subsequently determined that Gómez was guilty on Count II but that the amount of heroin involved was less than 100 grams.

On appeal, Gómez argues that through the special verdict question regarding drug quantity and the corresponding jury instructions, the district court constructively amended the superseding indictment in contravention of the Fifth Amendment. A constructive amendment, which is prejudicial per se, "occurs when the charging terms of the indictment are altered, either literally

_____

twenty years. See Perez-Ruiz, 353 F.3d at 15. Because the superseding indictment alleged 975 grams of heroin, a conviction had the potential to trigger a sentence above the default maximum. See 21 U.S.C. § 841(b)(1)(B)(i) (providing a 40-year maximum sentence for violations involving 100 grams or more of heroin). For a conviction to actually trigger the higher statutory maximum, however, the jury had to find beyond a reasonable doubt that the conspiracy was responsible for at least 100 grams of heroin. See Perez-Ruiz, 353 F.3d at 15.

-27-

or in effect, by prosecution or court after the grand jury has last passed upon them." United States v. Fisher, 3 F.3d 456, 462-63 (1st Cir. 1993) (internal quotation marks and citation omitted). Gómez contends that the district court changed the terms of the superseding indictment in this case when it allowed the jury to determine, via the special verdict form, whether Gómez was part of a conspiracy to possess less than 100 grams of heroin. In support of this contention, Gómez asserts that because the superseding indictment charged him with conspiring to possess approximately 975 grams of heroin, it must have referred to a conspiracy with Hueck and Sarruco to possess all eighty-five heroin pellets that Sarruco swallowed (which actually weighed 678 grams). He reasons that if the jury had found him guilty of this conspiracy, it would have indicated on the special verdict form that the amount of heroin was more than 100 grams. Because the jury found instead that the amount of heroin was less than 100 grams, Gómez contends that it must have convicted him of a conspiracy other than the one charged -- specifically, an ad hoc conspiracy with Agent Carmona (posing as Sarruco) to possess the four heroin pellets present in the hotel room, which weighed approximately 32 grams. We disagree.

No specific drug quantity needs to be proven for a jury to convict a defendant of conspiracy to possess with intent to distribute. See United States v. Restrepo-Contreras, 942 F.2d 96, 99 n.1 (1st Cir. 1991). It is therefore not erroneous per se to

allow a jury to find that a defendant is guilty of the crime charged but responsible for a lesser quantity of drugs than that specified in the indictment. See, e.g., United States v. Ruiz Solorio, 337 F.3d 580, 589-91 (6th Cir. 2003), cert. denied, 540 U.S. 1063 (2003). Gómez does not contend otherwise. He argues instead that, in this particular case, the effect of the special verdict question regarding drug quantity was to allow the jury to consider two different conspiracies, one charged and one uncharged.

While Gómez's argument is creative, it is ultimately unpersuasive. The court asked the jury to determine the drug quantity not to present it with an uncharged conspiracy, but rather to ascertain a fact necessary for sentencing. The court instructed the jury that it should convict Gómez on Count II only upon a finding that "the agreement specified in the indictment, and not some other agreement or agreements, existed between at least two people to possess a controlled substance with intent to distribute it" (emphasis added). It further instructed the jury that it should reach the question of drug quantity only upon a finding that Gómez was guilty. Nothing in these instructions suggests that the jury was free to convict Gómez for a conspiracy other than the one charged in the superseding indictment. See United States v. Owens, 167 F.3d 739, 756 (1st Cir. 1999) (noting that "our system of trial by jury is premised on the assumption that jurors will scrupulously follow the court's instructions"). Rather, the instructions and

-29-

special verdict form left room for the jury to determine that Gómez had participated in the charged conspiracy but to limit his responsibility to a lower amount. Neither the special verdict form nor the instructions accompanying it constituted a constructive amendment of the superseding indictment.[14]

## C.        Sufficiency of the evidence

To establish that the defendant is guilty on a conspiracy charge, the government must prove that "an agreement existed to commit the underlying substantive offense, and that the defendant elected to join the agreement, intending that the underlying offense be committed." United States v. Medina-Martinez, 396 F.3d 1, 5 (1st Cir. 2005), cert. denied, 125 S. Ct. 1955 (2005). Gómez asserts that there was insufficient evidence to convict him of a conspiracy in this case because there was no one with whom he could have conspired. We review a sufficiency of the evidence claim de novo, considering the evidence in the light most favorable to the

---

[14]Gómez asserts that the district court could have avoided the alleged constructive amendment by explaining to the jury that its finding on drug quantity was relevant only to sentencing. Gómez failed to preserve an objection to the jury instructions, in which the court properly told the jury that it should answer the drug quantity question only if it found that Gómez was guilty. Gómez did not object to the instruction after it was given. Moreover, when the court asked for input on a response to the jury's note about "the importance of 100 grams of heroin," Gómez agreed that no additional explanation regarding the significance of the drug quantity was necessary. Even if the instruction that he suggests on appeal would have been useful in avoiding jury confusion, the court's failure to give it certainly was not reversible error.

verdict.  See United States v. Rivera-Ruiz, 244 F.3d 263, 266 (1st Cir. 2001).  "Our inquiry is only whether the guilty verdict finds support in a plausible rendition of the record."  Id. (internal quotation marks omitted).  The remedy for a successful sufficiency of the evidence challenge is an order directing a judgment of acquittal.  See Burks v. United States, 437 U.S. 1, 18 (1978) ("Since we hold today that the Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient, the only 'just' remedy available for that court is the direction of a judgment of acquittal.").

1. Evidence of an ad hoc conspiracy with Carmona

Gómez's first sufficiency of the evidence claim rests on his contention that the jury convicted him of an ad hoc conspiracy formed with Agent Carmona in the hotel room, rather than the charged conspiracy involving Hueck, Sarruco, and others. Emphasizing that "there can be no conspiracy as a matter of law solely between a defendant and a government agent," United States v. Castellini, 392 F.3d 35, 51 n.11 (1st Cir. 2004), Gómez asserts that there was no evidence to support a conviction for the ad hoc conspiracy.  We have already rejected the premise underlying this sufficiency of the evidence claim.  Hence, we reject the related sufficiency of the evidence claim on the same basis.

## 2. Evidence of a conspiracy with Hueck and Sarruco

Gómez next argues that he could not be convicted of the charged conspiracy because there was insufficient evidence to connect him to either Sarruco, the drug courier, or Hueck, the drug supplier. With regard to Sarruco, Gómez contends that the government is estopped from claiming that the two were co-conspirators because, in granting a judgment of acquittal in the first trial, the district court found that "the only evidence in this case about the relationship between Gómez and Sarruco is that there was no relationship." With regard to Hueck, Gómez simply asserts that there was no evidence of a relationship between the two, and therefore no possible criminal agreement. We consider these claims in turn.

### a. Sarruco

Under the doctrine of collateral estoppel, "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." Ashe v. Swenson, 397 U.S. 436, 443 (1970). Gómez asserts that the district court determined during his first trial that he had no relationship with Sarruco, and therefore that the government could not attempt to show during the second trial that he and Sarruco were co-conspirators. The district court, however, made no such finding during the first trial. It concluded only that there was no personal relationship

-32-

between Gómez and Sarruco sufficient to support a charge that Gómez aided and abetted Sarruco's drug possession.[15] The court did not determine that the lack of a personal relationship would preclude the two from being co-conspirators. To the contrary, the court suggested that the facts likely would support the existence of a conspiracy.[16] The court's finding in the first trial that Sarruco and Gómez did not know each other therefore did not preclude the government from arguing in the second trial that the two were co-conspirators. See, e.g., United States v. Soto-Beníquez, 356 F.3d 1, 19 (1st Cir. 2004) ("The government need not show that each conspirator knew of or had contact with all other members."), cert. denied, 124 S. Ct. 2432 (2004).

There is ample circumstantial evidence that Sarruco and Gómez were part of a conspiracy to possess heroin with intent to distribute it. Sarruco told Hueck that he was waiting in Room 209

---

[15]The court explained that "[t]he only evidence in this case about the relationship between Gómez and Sarruco is that there was no relationship. That Sarruco did not know Gómez, never had met Gómez, wouldn't recognize Gómez, didn't know who Gómez was. Didn't have any care who showed up at the door. And Sarruco is the one who possessed [the heroin]. . . . And this is framed not as a conspiracy, but as he aided and abetted Sarruco. So this question is, what did he do to aid and abet Sarruco's possession." (Emphasis added.)

[16]Specifically, the court noted that Gómez was "part of the distributive chain" but that "it's a different matter to say he possessed [the heroin] with intent to distribute. He tried to, he would have had he not been arrested quickly. It was an attempted possession, probably a conspiracy, but none of that has been charged."

-33-

of the Hotel Iberia. Within hours, Gómez arrived at the hotel in a van containing a gun and knocked on the door of Room 209. After being shown four heroin pellets, Gómez asked Agent Carmona, posing as Sarruco, how many he had swallowed and offered to get him a laxative. Based on this evidence, a reasonable jury could have concluded that Gómez's presence at the hotel was not merely coincidental, as he claimed. Rather, the jury could have concluded, he visited Room 209 based on his participation in a conspiracy with Sarruco and others. See United States v. Gomez-Pabon, 911 F.2d 847, 853 (1st Cir. 1990) ("[P]roof [of membership in a conspiracy] may consist of circumstantial evidence, including inferences from surrounding circumstances, such as acts committed by the defendant that furthered the conspiracy's purposes.").

b. Hueck

Emphasizing that there is no direct evidence in the record linking him to Hueck, Gómez asserts that the two could not have been co-conspirators. As we have already discussed, however, Gómez's appearance at Room 209 of the Hotel Iberia shortly after Sarruco talked to Hueck, together with his interaction with Agent Carmona, were adequate to link Gómez to a conspiracy that included Hueck.

**D.**         **Pre-indictment delay**

Gómez was arrested in April 2000 on substantive drug possession and importation charges, and a related firearms charge. His trial on those charges ended on February 26, 2003 with a judgment of acquittal on two counts (drug possession and possession of a firearm) and a mistrial on the third count (drug importation). Instead of retrying Gómez on the drug importation charge, the government obtained a superseding indictment in March 2003 that charged Gómez with conspiracy to possess drugs with intent to distribute and conspiracy to import drugs. Gómez went to trial on the conspiracy charges in June 2003 and was ultimately convicted on the conspiracy to possess charge.

On appeal, Gómez asserts that the delay between his arrest in April 2000 and the filing of the superseding indictment in March 2003 violated his Sixth Amendment right to a speedy trial. The government points out, however, that Gómez's development of this argument is more consistent with a Fifth Amendment due process claim based on pre-indictment delay than with a Sixth Amendment speedy trial claim. We agree.

The purported Sixth Amendment claim in this case focuses entirely on pre-indictment delay. While delay between arrest and indictment may be relevant to the Sixth Amendment inquiry, see United States v. MacDonald, 456 U.S. 1, 7 (1982), we think it peculiar that Gómez's Speedy Trial Clause claim alleges only pre-

indictment delay and is entirely silent as to pre-trial delay. Moreover, Gómez has not identified the framework set forth in Barker v. Wingo, 407 U.S. 514, 530-33 (1972), for analyzing a Speedy Trial Clause claim, nor has he explained how the facts of this case fit that framework. Even after the government pointed out this omission in its brief on appeal, Gómez failed to develop the Sixth Amendment argument in his reply brief, focusing instead on the application of the Fifth Amendment Due Process Clause to his claim. Under these circumstances, we do not consider Gómez's Sixth Amendment claim.[17] See United States v. Berrio-Callejas, 219 F.3d 1, 3 (1st Cir. 2000) (treating a claim as waived where the appellant "neither presents developed argumentation nor provides pertinent case citations").

The essence of Gómez's complaint of pre-indictment delay is not that he was denied a speedy trial, but rather that his due process rights were violated. The Fifth Amendment Due Process Clause requires the dismissal of an indictment where the defendant can show that "the pre-indictment delay . . . caused substantial prejudice to [his] right[] to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." United States v. Marion, 404 U.S. 307, 324 (1971).

---

[17]We note that, even if we were to reach the Sixth Amendment claim, its fate would almost certainly mirror the fate of the Fifth Amendment due process claim, which requires us to consider some of the same factors.

-36-

1. <u>Prejudice</u>

Gómez identifies two forms of prejudice stemming from the government's delay in obtaining the superseding indictment. First, he asserts that because the substantive and conspiracy charges were brought consecutively, instead of concurrently, he was forced to defend himself twice. In light of the disposition of Gómez's first trial (the court declared a mistrial on one count and ordered that a retrial be scheduled), however, Gómez would have had to defend himself twice even if the superseding indictment had never been filed; the government just decided to bring different charges for the second trial. Moreover, there is no evidence that forcing Gómez to defend himself twice caused any prejudice, let alone substantial prejudice, to his right to a fair trial. <u>See</u> <u>id.</u> He does not assert that any evidence or witnesses were compromised by the delay, nor does he explain how the delay otherwise hampered his right to a fair trial.

Gómez also assigns prejudice to the three years he spent in prison before the superseding indictment was filed. The incarceration to which Gómez points, however, did not result from the pre-indictment delay of which he now complains. Gómez was imprisoned between April 2000 and February 2003 pending trial on the substantive charges set forth in the original indictment. He would have spent that time in prison regardless of when the conspiracy charges were filed. The government obtained the

-37-

superseding indictment approximately two weeks after the trial on the substantive charges ended in a mistrial. The relevant period of pre-indictment incarceration with respect to Gómez's Fifth Amendment prejudice claim is therefore a matter of weeks, not of years.

### 2. Tactical advantage

Even if Gómez were able to demonstrate prejudice resulting from the pre-indictment delay, his Fifth Amendment claim would falter on the second prong of the inquiry. There is simply no evidence that the government intentionally delayed indicting Gómez on the conspiracy charges to obtain a tactical advantage.[18] Moreover, although Gómez claims that the sequential indictment allowed the government to get "a second bite at the apple," he has not identified any specific advantage that the government gained. Gómez did not present any evidence in the first trial. He cannot argue, therefore, that the sequential prosecution allowed the government to preview his case or to adapt its case to his defense. In short, Gómez's due process claim must fail.

---

[18]The government explained on appeal that it did not realize until the end of the first trial that the offenses were more properly charged as conspiracies than as substantive drug crimes. We have no reason to doubt the government's characterization of this delayed realization as an innocent mistake.

**III.**

Finally, Gómez challenges the propriety of his sentence, arguing that a remand for resentencing is appropriate in light of the Supreme Court's decision in Booker. We agree and reject the government's contrary position.

This court deems Booker error preserved if the defendant argued at sentencing that the sentence violated Apprendi or Blakely,[19] or that the federal Sentencing Guidelines were unconstitutional. See United States v. Antonakopoulos, 399 F.3d 68, 76 (1st Cir. 2005). Where the defendant has preserved a Booker claim, we review for harmless error, remanding for resentencing unless the government can show beyond a reasonable doubt that a lower sentence would not be imposed under the post-Booker regime. United States v. Vázquez-Rivera, 407 F.3d 476, 489 (1st Cir. 2005).

In this case, the district court took account of several facts not found by the jury -- including, inter alia, the amount of heroin involved, the presence of a firearm, and the court's conclusion that Gómez perjured himself at trial -- in determining a sentence, and Gómez timely objected to the judicial fact-finding. Thus, Gómez preserved his claim of error. The government has not met its burden of proving that Gómez would not receive a lower

---

[19]Apprendi v. New Jersey, 530 U.S. 466 (2000) and Blakely v. Washington, 542 U.S. 296 (2004) were two of the cases that led to the Booker holding.

sentence under the advisory Guidelines.  See Vazquez-Rivera, 407 F.3d at 490 (even "factual certainty" as to basis for enhancements is not sufficient to show beyond a reasonable doubt that the judge would have applied the same sentence under an advisory Guidelines system).  We remand for resentencing.

The government asserts that a full remand is inappropriate.  Contending that Gómez preserved his Booker claim only with respect to the amount of drugs involved in the conspiracy, and not with respect to the gun and perjury findings, it argues that we should therefore review the latter two issues under a plain error standard.  The government maintains that Gómez cannot meet that standard and thus that we should issue a partial remand, instructing the district court only to recalculate the base offense level.  We reject this invitation to disaggregate Booker claims and consider them piecemeal.  Such an approach is inconsistent with this court's Booker jurisprudence under Antonakopoulos.

Of course, our decision to remand should not be read as a "suggestion or a prediction that [Gómez's] sentence will necessarily be altered."  United States v. Heldeman, 402 F.3d 220, 224 (1st Cir. 2005).  This is especially true "where the remand arises out of a preserved error and where the harmless error test makes even a modest possibility of change enough to warrant

remand." <u>United States</u> v. <u>Lata</u>, No. 04-2051, 2005 WL 1491483, at *5 (1st Cir. June 24, 2005).

**IV.**

Gómez's conviction is **<u>affirmed</u>**; his sentence on that conviction is **<u>vacated</u>**. We **<u>remand</u>** for resentencing consistent with this opinion.

**<u>So ordered</u>**.