# United States Court of Appeals

## For the First Circuit

No. 03-1329

UNITED STATES OF AMERICA,

Appellee,

v.

RAFAEL YEJE-CABRERA,

Defendant, Appellant.

No. 03-1510

UNITED STATES OF AMERICA,

Appellee,

v.

WILFREDO PÉREZ,

Defendant, Appellant.

Nos. 03-1874
03-1969

UNITED STATES OF AMERICA,

Appellee/Cross-Appellant,

v.

WILLIAM OLIVERO, a/k/a K, a/k/a ALEJANDRO,

Defendant, Appellant/Cross-Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, Chief U.S. District Judge]

---

Before

Boudin, Chief Judge,
Lynch, Circuit Judge, and
Schwarzer,[*] Senior District Judge.

---

Joseph S. Oteri, with whom Kimberly Homan was on brief, for Rafael Yeje-Cabrera.
Juan Ortiz-Lebrón for Wilfredo Pérez.
Lawrence D. Gerzog for William Olivero.
Joseph C. Wyderko, Attorney, Criminal Division, U.S. Department of Justice, with whom Michael J. Sullivan, United States Attorney, and Heidi E. Brieger, Assistant United States Attorney, were on brief, for the United States of America.

---

November 2, 2005

---

[*] Of the Northern District of California, sitting by designation.

-2-

**LYNCH**, <u>Circuit Judge</u>.  This case raises several issues of importance, including whether a district court may punish the prosecution by granting the defendant a lower than warranted sentence after trial because the government had engaged in "fact bargaining."

Three men, Rafael Yeje-Cabrera, Wilfredo Pérez, and William Olivero, were convicted, after a twenty-day jury trial, of conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. § 846.  The conspiracy distributed over 260 kilograms of cocaine.  Yeje-Cabrera was also convicted of attempted possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and of bribery of a federal agent in violation of 18 U.S.C. § 201(b).  These men, and others, distributed truckloads full of cocaine obtained from two Mexican suppliers; the drugs were driven from the Southwest to Massachusetts, Rhode Island, and New York.  Yeje-Cabrera, of Westport, Massachusetts, was a principal in the operation and received a life sentence and a fine of $16 million.  Yeje-Cabrera was also ordered to forfeit $5.2 million and two parcels of real property.  Pérez helped to distribute the cocaine and was an agent for Yeje-Cabrera.  He was sentenced to thirty years' imprisonment and fined $4 million.  Olivero, who lived in New York, collected the money, distributed cocaine, and assisted with the shipments.  By contrast with the

thirty-year sentence for Pérez, Olivero was sentenced to 48 months' imprisonment, followed by five years of supervised release.

Yeje-Cabrera attacks his conviction and the forfeiture order. Pérez attacks his conviction through a premature ineffective assistance of counsel claim. Olivero attacks his conviction. All three defendants attack their sentences.

The government was also unhappy with the sentence imposed on Olivero and has cross-appealed. It is the government's appeal which raises the most significant issues in the case. In order to sanction the government for what it considered to be impermissible "fact bargaining," the district court declined to follow the Sentencing Guidelines. This was error. The fact bargaining was the government's willingness during earlier unsuccessful plea negotiations to recommend a lower sentence when the facts known to it at the time, or so the court found, justified a higher sentence. The court declined to give a warranted firearms enhancement and did give an unwarranted minimal-role reduction. The court also concluded, mistakenly, that its role as a fact finder with respect to drug quantity for sentencing purposes had been written out of the Sentencing Guidelines by the decision in Apprendi v. New Jersey, 530 U.S. 466 (2000).

We affirm all three convictions and the sentences of Yeje-Cabrera and Pérez. We vacate Olivero's sentence and remand it to the district court for re-sentencing.

## I. Statement of Facts and Proceedings

Yeje-Cabrera was a leader of a conspiracy to ship cocaine from the Southwest to various states in the Northeast, where it was sold. Pérez assisted with the distribution of cocaine. Olivero assisted with the collection of money and the distribution and shipping of cocaine.

Two seizures of tractor-trailers full of cocaine provide the bookends for this case. In April of 2001, after using a camera to conduct surveillance of a parking lot in New York City, agents of the Drug Enforcement Administration (DEA) seized a tractor-trailer containing over 300 kilograms of cocaine and over $400,000 in cash. The agents found a cellular telephone inside that contained telephone numbers for Yeje-Cabrera and Olivero. DEA agents then conducted surveillance of Yeje-Cabrera's home in Westport, Massachusetts via a hidden camera in a birdhouse, but Yeje-Cabrera discovered the camera and realized that he was under surveillance. Some time later, the DEA agents applied for and received permission to conduct electronic surveillance of Yeje-Cabrera's phone line. This initial wiretap application was followed by others seeking permission to conduct surveillance on multiple phone lines belonging to Yeje-Cabrera and another suspect. All were allowed.

In August 2001, the INS[1] initiated removal proceedings in Boston against Yeje-Cabrera and detained him. He reacted by bribing an INS agent to terminate the proceedings and, in a series of recorded conversations, offering to pay another bribe for information regarding the drug investigation. Yeje-Cabrera was released on his own recognizance and resumed his drug business. Pérez and Olivero, with Yeje-Cabrera, continued to arrange for and conduct the shipment of, payment for, and distribution of cocaine. Meanwhile, DEA agents were monitoring Yeje-Cabrera's phone lines and attempting to engage in other forms of surveillance. The agents prepared to move in on the operation on December 8, 2001, when Yeje-Cabrera and his associates were slated to receive a large shipment of cocaine near New Bedford, Massachusetts. DEA agents and state police were out in force that morning, searching for the participants in the anticipated delivery. As it happened, the drugs came to them: the ill-fated driver of the tractor-trailer, instead of making his delivery, accidentally backed into a state trooper's cruiser. Law enforcement agents seized the tractor-trailer and discovered that it contained 260 kilograms of cocaine. That seizure has the dubious distinction of being the largest drug seizure in Massachusetts history.

---

[1] On March 1, 2003, the relevant functions of the INS were transferred to the Department of Homeland Security, and the INS subsequently ceased to exist. See Homeland Security Act of 2002, Pub. L. No. 107-296, § 471, 116 Stat. 2135, 2205 (codified as amended at 6 U.S.C. § 291(a)).

The conspiracy continued to receive and distribute cocaine for a short while longer. Finally, on December 21, 2001, officers arrested Yeje-Cabrera, Pérez, and several other coconspirators. Olivero ultimately turned himself in.

All three defendants were charged in the December 20, 2001 indictment with conspiracy to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii), and 846. Yeje-Cabrera was also charged with two additional crimes: attempted possession with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii), and 846, and bribery of a federal agent, in violation of 18 U.S.C. § 201(b). The indictment charged that all defendants held certain real property, vehicles, and currency which were subject to criminal forfeiture under 21 U.S.C. § 853.

Before trial, Yeje-Cabrera unsuccessfully moved to suppress the evidence obtained as a result of the various wiretaps. He argued that the affidavits submitted in support of the electronic surveillance applications failed to satisfy the "necessity" requirement of 18 U.S.C. § 2518(1)(c).

The jury convicted Yeje-Cabrera of all counts; it returned a special verdict, finding that he was responsible for more than 260 kilograms of cocaine on the conspiracy charge and exactly 260 kilograms on the attempt charge, and a forfeiture

verdict. The jury convicted Pérez of conspiracy to distribute more than five kilograms of cocaine. It also convicted Olivero of conspiracy to distribute cocaine, though it did not attribute to him a specific drug quantity. That failure by the jury to make a specific finding led to some of the conviction and sentencing issues we discuss later.

The district court sentenced Yeje-Cabrera to life imprisonment. It also fined him and, during sentencing, stated that it was "allow[ing] the government's recommendation for forfeiture." The court sentenced Pérez to 360 months' imprisonment and fined him $4 million. The court sentenced Olivero to 48 months of incarceration.[2]

## II. Discussion

**A. Challenges to Conviction**

1. <u>Denial of Motion to Suppress Wiretap Evidence</u>

-----

[2] After both Olivero and the government filed notices of appeal, the district court issued an order purporting to vacate Olivero's sentence in order to impose an even shorter sentence. The court cited concerns about the appropriate drug quantity to attribute to Olivero in light of <u>Apprendi</u> and other authorities, and it stated that it was going to schedule a new sentencing hearing. Upon being told by the government that it lacked jurisdiction, the court vacated its attempt to vacate Olivero's sentence. The court did proceed, however, to issue what was in essence a sentencing memorandum pertaining not only to Olivero's case but also to several other unrelated criminal cases, explaining in more detail its reasons for the sentence it had imposed on Olivero and its belief that the maximum constitutionally permissible sentence for Olivero was 16 months. <u>United States</u> v. <u>Green</u>, 346 F. Supp. 2d 259, 327, 332 (D. Mass. 2004).

-8-

Yeje-Cabrera argues that the district court should have excluded evidence derived from electronic surveillance of telephone conversations because the wiretap applications failed to meet the statutory requirements. If the intercepted conversations and all evidence derived therefrom had been properly excluded, he argues, his convictions would not stand.

Yeje-Cabrera bases his challenge on 18 U.S.C. § 2518(1)(c), which states that each wiretap application "shall include . . . a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."

The parties disagree on the proper standard of review. We have long applied a unitary standard of review in § 2518(1)(c) cases: "When reviewing the government's showing of necessity, our role 'is not to make a de novo determination of sufficiency as if [we] were [the issuing judge], but to decide if the facts set forth in the application were minimally adequate to support the determination that was made." United States v. Santana, 342 F.3d 60, 65 (1st Cir. 2003) (quoting United States v. López, 300 F.3d 46, 53 (1st Cir. 2002) (alterations in original)).

Yeje-Cabrera urges us to adopt a bifurcated standard of review: first, we should review de novo whether the applicant provided to the issuing judge a "full and complete statement" as

required by § 2518(1)(c); second, if and only if the first prong is satisfied, we should review for abuse of discretion the issuing judge's determination that, under the circumstances described, electronic surveillance was necessary. One reason for this approach, Yeje-Cabrera suggests, is that § 2518 imposes separate duties on separate actors: the applicant has an "absolute" duty under § 2518(1)(c), while the issuing judge has a "discretionary" duty under § 2518(3)(c).[3] Another reason for de novo review of the "full and complete statement" requirement, he argues, is that it would give effect to the necessity requirement: it would ensure that necessity is actually present, that the issuing judge is able to engage in an independent determination on that point, rather than one subject to the affiant's manipulation of the facts, and that meaningful appellate review is possible.

Though we recognize that other circuits have adopted bifurcated standards similar to that proposed by Yeje-Cabrera, see, e.g., United States v. Ramirez-Encarnacion, 291 F.3d 1219, 1222 n.1 (10th Cir. 2002); United States v. Blackmon, 273 F.3d 1204, 1207 (9th Cir. 2001), this panel is bound by circuit precedent.

_____

[3] Section 2518(3)(c) provides that upon receiving an application as described in § 2518(1), "the judge may enter an ex parte order" authorizing the wiretap "if the judge determines on the basis of the facts submitted by the applicant that . . . normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."

-10-

Moreover, we see no reason to depart from the unitary standard. First, Yeje-Cabrera's approach artificially separates two concepts that are a unified whole in the statute: "full and complete statement," and "necessity." One might ask: of what must the applicant provide a "full and complete statement"? The answer is: of "whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." § 2518(1)(c). This is one requirement, not two: a full and complete statement regarding necessity, that is, circumstances in which a wiretap, though disfavored as an investigative technique, is justified. See United States v. Kahn, 415 U.S. 143, 153 n.12 (1974) (the necessity requirement is "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime"). We see no basis for splitting in two what is properly a single inquiry.

The determination of necessity is properly committed to the issuing judge in the first instance, and we will uphold the sufficiency of the affidavit wherever "the issuing court could have reasonably concluded that normal investigatory procedures reasonably appeared to be unlikely to succeed." López, 300 F.3d at 53 (quoting United States v. Ashley, 876 F.2d 1069, 1074 (1st Cir. 1989)). It is simply "not our province to engage in de novo review of an application." United States v. Bynum, 763 F.2d 474, 476 (1st

-11-

Cir. 1985) (quoting United States v. Smith, 726 F.2d 852, 864 (1st Cir. 1984)); see also United States v. Rivera-Rosario, 300 F.3d 1, 19 n.23 (1st Cir. 2002).

We also note that the issuing judge has the power to "require the applicant to furnish additional testimony or documentary evidence in support of the application," § 2518(2), if such information is necessary. Of course, officers may not deliberately omit material information that, if known to the issuing judge, would prevent a finding of necessity. Should the defendant come to believe that the government omitted material information that would have prevented a finding of necessity, he is free to seek a hearing under Franks v. Delaware, 438 U.S. 154 (1978). See, e.g., United States v. Stewart, 337 F.3d 103, 105 (1st Cir. 2003) (district court held Franks hearing with government's consent where search warrant affidavits misleadingly omitted multiple pieces of information casting doubt on credibility of informants); id. at 105-06 (not error to deny suppression of resulting evidence where improperly omitted information was immaterial to overall determination of probable cause); id. at 107 n.2 ("An evidentiary hearing is required only if the defendant is able to show that alleged misstatements or omissions are material to the probable cause determination."). A Franks hearing, not de novo review in this court, is the proper route for addressing that concern. Cf. Rivera-Rosario, 300 F.3d at 20 ("Material omissions

in a government's application are . . . sufficient to constitute the basis for a <u>Franks</u> evidentiary hearing." (citation omitted)). Yeje-Cabrera, however, did not pursue this option.

Applying our unitary standard of review, we inquire whether the affidavits satisfied the statutory requirement. After reviewing the sealed affidavits, we hold that they provided a sufficient basis for the issuing judge to authorize the wiretap. Without revealing any of the information for which it was appropriate to seal the affidavits, we note that the initial affidavit supplies a detailed overview of the investigation to date, concrete reasons why a wiretap was necessary, and thorough explanations of how traditional investigative techniques were proving, or were expected to prove, unlikely to succeed or dangerous. These representations were supported.

The initial affidavit could reasonably be thought to be more than adequate. After receiving authorization to conduct the first wiretap, the officers applied for and received authorization to conduct others and to extend some beyond the initial time period. As Yeje-Cabrera points out, the subsequent affidavits do overlap considerably with the initial affidavit and with each other, sometimes containing identical wording of some points. The last affidavit, seeking authorization to wiretap a telephone line over which officers expected to hear "vital information" on a large cocaine delivery expected to occur the next day, incorporates by

reference the statement of necessity set out in a prior (attached) affidavit, instead of setting out a fresh one. Despite Yeje-Cabrera's characterization of the affidavits as consisting largely of "boilerplate," all the affidavits did contain much that was concrete and pertained to this specific investigation. See López, 300 F.3d at 53-54 (rejecting defendant's argument that application was "mere boilerplate" where affidavit contained specific details about the investigation and about attempts to use less invasive surveillance techniques). We have reviewed these affidavits and find no flaws in the issuing court's determination that they were sufficient.

Yeje-Cabrera raises several objections to the conclusion that there was no abuse of discretion by the issuing judge in determining that the affidavits were sufficient. His primary argument is that a statement which appears in all of the affidavits constitutes an admission that the affiant "expressly ignored the 'full and complete statement' requirement." The officer applying for the wiretap authorization stated near the beginning of each affidavit:

> Since this Affidavit is being submitted for the limited purpose of securing an order authorizing the interception of wire communications, I have not included details of every aspect of this investigation to date. Facts not set forth herein are not being relied on in reaching my conclusion that an order should be issued.

-14-

Yeje-Cabrera argues that 18 U.S.C. § 2518(1)(c) requires the application to describe "all prior investigative steps undertaken."

The argument fundamentally misreads 18 U.S.C. § 2518(1)(c). The requirement of a full and complete statement cannot possibly mean that every single detail, even if relevant to the wiretap, must be included. The plain language of § 2518(1)(c) only requires a full and complete statement "as to" the crucial issue: "whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried." 18 U.S.C. § 2518(1)(c). Many aspects of an investigation, especially in a large, complex case like this one, will not be relevant to the question of whether a particular wiretap is necessary. And even if there is some relevance, the officer need not detail every single fact, so long as sufficient facts are described as to the crucial issue and material contrary facts are not omitted. If there are relevant and material omissions, the issuing judge may deny the application or seek additional information, or the defendant may seek a <u>Franks</u> hearing.

Second, Yeje-Cabrera argues that the government did not do enough to exhaust traditional investigative methods before resorting to the wiretap. We have previously made clear, though, that "the government need not demonstrate that it exhausted all investigative procedures." <u>Santana</u>, 342 F.3d at 65 (citing <u>López</u>, 300 F.3d at 52). The wiretap application simply "must 'demonstrate

-15-

that the government has made a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls.'" Id. (quoting United States v. London, 66 F.3d 1227, 1237 (1st Cir. 1995)); see also Ashley, 876 F.2d at 1072 ("[T]he government is not required to show that other methods have been wholly unsuccessful. Nor is the government forced to run outlandish risks or to exhaust every conceivable alternative before requesting authorization for electronic surveillance." (citations omitted)). We conclude that the district court did not err in refusing to suppress the evidence obtained from the wiretaps.

2. Claim of Error in District Court Inquiry of Jurors

Yeje-Cabrera raises a claim of jury taint arising from a note that a juror sent to the judge. We review for abuse of discretion the claim that the trial court failed to conduct an appropriate inquiry into allegations of jury taint. United States v. Paniagua-Ramos, 251 F.3d 242, 249 (1st Cir. 2001).

At the commencement of the trial, the district court instructed the jurors that they must not discuss the case with each other or with anyone else during the trial, that it was the government's burden to prove guilt beyond a reasonable doubt, and that the defendants were not obliged to testify or present any evidence. For the first ten days of trial, there was no inkling of

-16-

anything awry with any juror.  Then, during the eleventh day of trial, a juror sent a note to the judge.  The note said:

> WHY [ARE] THE DEFENDANTS
> NOT GOING TO BE
> CROSS-EXAMINED?
>
> <u>4 DEFENDANTS SHOULD
> BE CROSS-EXAMINED!</u>
>
> <u>THIS SHOULD BE
> DONE IN THIS CASE!</u>

The court shared this note with counsel.  Defense counsel urged the court to identify the juror, interview her and the other jurors individually to ascertain whether she had spoken with them, then excuse her.  The court declined, opting instead to issue a strongly worded curative instruction on the burden of proof and on jurors' duty to refrain from discussion.  The court instructed the members of the jury that if any of them could not follow these instructions, he or she was to speak with the clerk.  It polled the jury as a group, asking for a show of hands on whether jurors had discussed the case among themselves.  No juror admitted doing so.

That night and the next morning, the juror who had sent the note to the judge communicated with the court and its clerk multiple times.  She expressed that she was upset over the judge's handling of the note and that she still had opinions about the case that were consistent with her note.  By the time trial was to resume on the twelfth day, the court had dismissed this juror and so informed counsel.  Defense counsel again requested that the

court interview the remaining jurors individually, but the court declined, stating that the jurors had already satisfactorily responded to the prior day's group inquiry, and that since that time they could have had no contact with the note-sending juror.

Yeje-Cabrera's essential claim is that the juror who sent the note, although removed from the jury the next day, likely had expressed her strongly felt views to the other jurors and thus tainted the jury's deliberations. The court's response to the note, Yeje-Cabrera argues, was inadequate. In particular, he points to "peer pressure," and to the fact that the court had just delivered a "stinging rebuke" to the jury, as factors rendering the show of hands unreliable. Even though the jurors unanimously indicated that they had followed the court's instructions not to discuss the case among themselves, he argues, the court did not do enough: under these circumstances, a juror who had not followed instructions could not be expected to raise a hand. He argues that the court should have individually interviewed the juror who sent the note and all the other members of the jury to ascertain whether they had followed instructions. Yeje-Cabrera further argues that the district court's method of handling the problem was so deficient as to require that the conviction be vacated: he claims that the district court could not "do effective damage control," and that this court cannot engage in meaningful appellate review, because the district court's failure to conduct individualized

inquiries deprived it and us of essential information.  Such hyperbole does not win the day.

This was a difficult situation and the trial judge acted well within the range of permissible options.  Trial judges have a wide latitude in how to handle a claim of potential juror misconduct.  See Paniagua-Ramos, 251 F.3d at 250 ("[W]hile a trial court has an unflagging duty adequately to probe a nonfrivolous claim of jury taint, the court has wide discretion to determine the scope of the resulting inquiry and the mode and manner in which it will be conducted." (citations omitted)).

Here the claim of taint is not about the juror who sent the note; she was dismissed after she said she could not continue in the case.  The question is whether she tainted the others.  Yeje-Cabrera draws the inference -- from the emphatic nature of the juror's note to the judge -- that the juror had disseminated her views to the other jurors, in violation of instructions.  Moreover, he argues, her expressed views might have overridden in the other jurors' minds the court's strong curative instruction about the government's burden of proof.

While the posited scenario is possible, we think that such inferences are not reasonable.  During the show of hands, the juror who sent the note and the other jurors denied there had been discussions.  We acknowledge that asking jurors en masse, before their peers, whether they have failed to comply with the court's

instructions may tend to discourage an honest affirmative response. But the court also invited individual jurors to contact it afterwards, and none, other than the juror who sent the note, did so.

Even if the one juror had communicated her views to the other jurors, there is also no reason to think those jurors were dissuaded from following the instructions of the judge, much less that this somehow led jurors to penalize the defendants for their decision not to take the stand.

There was no abuse of discretion.  Cf. United States v. Richman, 600 F.2d 286, 295-96 (1st Cir. 1979) (where court satisfied itself that other jurors had not overheard one juror's potentially improper remark and had not been discussing case among themselves, refusal to conduct individualized inquiry of remaining jurors was within court's discretion).

### 3. Ineffective Assistance of Counsel

At the request of his client, counsel for Pérez has presented on this direct appeal a claim for ineffective assistance of counsel.  His counsel has correctly advised Pérez that this court will not entertain an ineffective assistance claim on direct appeal, absent a sufficiently developed evidentiary record. United States v. Woods, 210 F.3d 70, 74 (1st Cir. 2000).  The record evidence here is not sufficiently developed to enable either

-20-

counsel or the court to appraise the merits of Pérez's ineffective assistance claim.

4. <u>Drug Quantity</u>

Olivero argues that since the jury did not attribute a specific drug quantity to him, his conviction must be vacated. His claim results from the jury verdict form employed here:

> On the charge of conspiracy to possess cocaine
> with intent to distribute, we find
>     a.  Rafael Yeje-Cabrera
>         _____not guilty
>         \_\_\_✓\_\_guilty of conspiracy involving
>         greater than 260 K's of cocaine
>     b.  Wilfredo Perez
>         _____not guilty
>         \_\_\_✓\_\_guilty of conspiracy involving
>         greater than 5 K's of cocaine
>    . . .
>     d.  William Olivero
>         _____not guilty
>         \_\_\_✓\_\_guilty of conspiracy involving
>         _____ of cocaine

The net result was that the jury did not find a specific drug quantity as to Olivero but did find he was guilty of conspiracy to distribute cocaine. The jury was not asked to determine the quantity of drugs involved in the conspiracy as a whole. The court did, however, instruct the jury that the government had to prove beyond a reasonable doubt that each defendant joined "this conspiracy" -- the one charged in the indictment, a "wholesale" rather than "retail" conspiracy to distribute cocaine. The

indictment had alleged conspiracy to possess with intent to distribute "more than 5 kilograms of cocaine."[4]

From this, Olivero's counsel argues that unless the jury has found a specific quantity of drugs, a defendant cannot be guilty of conspiracy. He bases this argument on United States v. Gonzalez, 420 F.3d 111 (2d Cir. 2005). He attributes to the case a holding that drug quantity must always be pled and proved beyond a reasonable doubt to a jury before there can be a conspiracy conviction. In the absence of a jury question asking the jurors to find the quantity of drugs involved in the conspiracy itself, he argues, that standard has not been met.

Olivero confuses issues of criminal liability with issues of sentence. He overreads Gonzalez, which simply holds that a defendant charged with an aggravated drug conspiracy under 21 U.S.C. § 841(b)(1)(A), who does not admit but rather disputes the

---

[4] The government objected to the district court's plan to ask the jury to determine the quantity of cocaine as to which each individual defendant had conspired, instead of the quantity of cocaine involved in the conspiracy as a whole. The prosecution asked that the jury be required to find only the facts charged in the indictment, that is, that each defendant had participated in the conspiracy, and that the conspiracy as a whole sought to possess with intent to distribute more than five kilograms of cocaine. The prosecution renewed its objection after the court instructed the jury. The defense attorneys did not object on the drug-quantity point, and Yeje-Cabrera's attorney said he preferred the court's proposition. Olivero's attorney made some requests about jury instructions, but none pertaining to the drug-quantity issue. After the jury was instructed, Olivero's attorney objected to the court's telling the jury that drug quantity was a sentencing issue, saying he would have preferred for the court to say that the amount went to "other reasons or other legal reasons."

-22-

requisite drug quantity, could not be held to a guilty plea to that offense. Id. at 115. Rather, such a defendant's plea "at best supports a conviction on a lesser, unquantified drug charge, whose sentencing range is prescribed by § 841(b)(1)(C)." Id.

Treating 21 U.S.C. § 841(b)(1)(C) as establishing a default statutory maximum sentence, the maximum is still 20 years.[5] This is so no matter how small the amount of the cocaine which was the subject of the conspiracy. This court has previously affirmed the conviction but remanded for resentencing no higher than the default statutory maximum of 20 years on similar facts. See United States v. Pérez-Ruiz, 353 F.3d 1 (1st Cir. 2003), cert denied, 541 U.S. 1005 (2004) ("Pérez-Ruiz I") (defendant was charged with conspiracy to distribute specific drug quantities, but jury was not instructed that it had to find specific amounts in order to convict and there were no special verdict findings). "No specific drug quantity needs to be proven for a jury to convict a defendant of conspiracy to possess with intent to distribute. It is therefore not erroneous per se to allow a jury to find that a defendant is guilty of the crime charged but responsible for a lesser quantity of drugs than specified in the indictment." United States v. Gómez-Rosario, 418 F.3d 90, 104 (1st Cir. 2005) (citations omitted); see also id. at 103-05 (special verdict form had one

_____

[5] The maximum is higher if additional facts are present. See 21 U.S.C. § 841(b)(1)(C).

-23-

blank for filling in guilty/not guilty and other blanks for filling in defendant's responsibility for particular drug quantity, and jury was instructed to convict only upon finding that the "agreement specified in the indictment, and not some other agreement . . . existed"). There is no basis here for reversing Olivero's conviction.

## B. Forfeiture Order: Violation of Rule 32.2(b)(3)

Yeje-Cabrera asks on appeal that the final order forfeiting $5.2 million and two parcels of land be reversed because it was entered after judgment was entered instead of being incorporated into the judgment as required by Fed. R. Crim. P. 32.2(b)(3). The Rule provides: "At sentencing -- or at any time before sentencing if the defendant consents -- the order of forfeiture becomes final as to the defendant and <u>must</u> be made a part of the sentence and <u>be included in the judgment</u>." Fed. R. Crim. P. 32.2(b)(3) (emphases added).

We reject the government's position that Rule 32.2(b)(3) was not violated because the court told the defendant at sentencing that it was "allow[ing]" the preliminary order of forfeiture to become final. <u>Cf.</u> <u>United States</u> v. <u>Melendez-Santana</u>, 353 F.3d 93, 100 (1st Cir. 2003) (stating that "where the conditions of supervised release announced at the sentencing hearing conflict in a material way with the conditions of supervised release in the written sentencing order, the oral conditions control"), <u>overruled</u>

-24-

in part on other grounds by <u>United States</u> v. <u>Padilla</u>, 415 F.3d 211, 215 (1st Cir. 2005) (en banc). The oral sentencing does not trump Rule 32.2(b)(3). <u>See</u> <u>United States</u> v. <u>Pease</u>, 331 F.3d 809, 814-15 (11th Cir. 2003) (forfeiture, to be valid, must be included in the judgment); <u>cf.</u> <u>United States</u> v. <u>Petrie</u>, 302 F.3d 1280, 1284-85 (11th Cir. 2002) (where forfeiture was not mentioned at sentencing and only vaguely mentioned in judgment, district court lacked jurisdiction to enter preliminary forfeiture order six months after sentencing); <u>but</u> <u>see</u> <u>United States</u> v. <u>Loe</u>, 248 F.3d 449, 464 (5th Cir. 2001) (where forfeiture was mentioned at oral sentencing but not in written judgment, "the oral ruling prevails" over conflicting written order, so that "[t]he court's oral pronouncement on forfeiture, which it issued at the sentencing hearing, consequently remains effective in the face of a contrary written judgment"). There was a clear violation of the "must be included in the judgment" portion of the Rule.

The appropriate remedy for violation of the Rule depends on context. One very serious situation would be if the violation bespoke a lack of notice and opportunity for the defendant and third parties to object to a proposed forfeiture. <u>Cf.</u> <u>Pease</u>, 331 F.3d at 816 n.18 (oral sentencing did not include forfeiture); <u>Petrie</u>, 302 F.3d at 1284 (forfeiture was not mentioned at sentencing hearing, written judgment merely stated that defendant was "subject to forfeiture as cited" in one count of the

-25-

indictment, and preliminary forfeiture order was not entered until six months after sentencing).

That is not the situation here. The forfeiture claim was contained in the indictment, and the jury returned a special verdict finding that Yeje-Cabrera had derived the property "directly or indirectly, as a result of the conspiracy to possess cocaine with intent to distribute." The presentence report mentions the forfeiture allegation in the indictment and states that the jury "returned a verdict of guilty on all counts." The "Sentencing Options" section of the presentence report does not, however, mention forfeiture. Two months after the verdict, the government moved for a preliminary order of forfeiture; the motion was granted on February 24, 2003. Two days later, at sentencing, the district court stated that it was "allow[ing] the government's recommendation for forfeiture." When the court said this, it must have been referring to a recommendation of a final order of forfeiture, since the preliminary order had already issued.

For reasons which are unclear, no order of forfeiture was set forth in the judgment entered on March 3, or in the amended judgment entered on May 9, 2003. On August 14, 2003, the government moved for a final order of forfeiture. The government apparently did not realize that the "must be included in the judgment" requirement of Rule 32.2 had not been met, as it did not move to correct the judgment under Rule 36. See Fed. R. Crim. P.

-26-

36 ("After giving any notice it considers appropriate, the court may at any time correct a clerical error in a judgment, order, or other part of the record, or correct an error in the record arising from oversight or omission."). On September 19, 2003, the court entered a final order of forfeiture.

Importantly, it appears that Yeje-Cabrera never once opposed the merits of the proposed forfeiture. The government so represents, and Yeje-Cabrera does not represent to the contrary. Essentially, Yeje-Cabrera argues now that because there was a violation of Rule 32.2, he is entitled to reversal of the forfeiture order, which he had never opposed on the merits. We disagree.[6]

There may be occasions when violations of Rules warrant a remedy of reversal. But the portion of Rule 32.2 which was violated here is largely a housekeeping rule and does not itself go to any fundamental rights of defendants.

One of the primary purposes of Rule 32.2, as its history shows, is to allow for the entry of a preliminary order of forfeiture. Before the 1996 Amendments, the predecessor Rule 32(d)(2) did not explicitly provide for such a preliminary

---

[6] We bypass the government's argument that by failing to oppose entry of the post-judgment final order of forfeiture, at best Yeje-Cabrera is entitled to plain error review. The outcome would be the same here regardless of the standard of review. We do note, however, that if either party had called this matter to the attention of the court, we are sure the court would have remedied the problem under Fed. R. Crim. P. 36.

forfeiture procedure. In 1996, Rule 32(d)(2) was amended to provide for the entry of a preliminary order of forfeiture after the forfeiture verdict and after "providing notice to the defendant and a reasonable opportunity to be heard." The amendment added that "[a]t sentencing, a final order of forfeiture shall be made part of the sentence and included in the judgment." This marks the first appearance of language similar to that relied upon by Yeje-Cabrera.

The Advisory Committee Notes to the 1996 Amendments illustrate that the drafters were primarily concerned with enabling the government to obtain a preliminary order of forfeiture. The Notes cite three problems the new procedure avoids: delay in the government's locating and preserving forfeited assets, delay in third parties' ability to assert interests in the property, and the need to resort to restraining orders to maintain the status quo. See Fed. R. Crim. P. 32 advisory committee's notes (1996 amendments). The drafters do evince concern with protecting the defendant's interests, but do so by highlighting the defendant's right to notice and an opportunity to be heard, rather than by emphasizing the written judgment requirement. See id.

Rule 32.2 serves other efficiency interests as well, in particular, preserving the resources of the judicial system and of potentially interested third parties. The Advisory Committee Notes on Subdivision (b) of Rule 32.2 are concerned almost entirely with

improving the procedure by which the relative ownership interests of the defendant and of third parties are determined. See Fed. R. Crim. P. 32.2 advisory committee's notes (2000 amendments). Tellingly, the Advisory Committee Notes do not focus on the written judgment requirement at all. Instead, they focus on explaining how the Rule avoids wasteful litigation. The Notes discuss how the coexistence of former Rule 31(e) with 21 U.S.C. § 853(n) and 18 U.S.C. § 1963(l) caused duplicative proceedings to determine relative ownership interests in property subject to forfeiture, and they explain how the new procedure avoids that problem.

To be sure, Rule 32.2 also does serve interests of the defendant. In particular, the Rule ensures that all the penalties imposed on the defendant occur as part of a "package," so that forfeiture is not imposed above and beyond a sentence that the court had already determined to be adequate. The Eleventh Circuit's observation in Pease puts the point well:

> [F]orfeiture is part of the defendant's sentencing package for an obvious reason. The magnitude of the forfeiture may influence how the court treats the other parts of the package. For example, if forfeiture is sizeable, the court may impose a fine at the bottom of the Sentencing Guidelines' range or, if the forfeiture would render the defendant impecunious, perhaps no fine at all.

Pease, 331 F.3d at 816 (discussing Rule 32, the predecessor to Rule 32.2, which in this respect was similar to the current Rule). On the facts of this case, mere failure to comply with Rule

-29-

32.2(b)(3)'s written judgment requirement does not harm this interest of the defendant. The district court included the forfeiture at the time it orally sentenced; the purpose of avoiding unduly large sentence/forfeiture "packages" was served here.

This court addressed the mirror image of our problem in United States v. Ferrario-Pozzi, 368 F.3d 5 (1st Cir. 2004), where the final order of judgment did include the written order of forfeiture, but defendant argued it had not been included in the oral pronouncement of the sentence. In fact, the defendant had agreed at sentencing "that he was not contesting forfeiture itself, but simply the amount over two million dollars," and he requested that this issue be resolved at a later hearing. Id. at 7. Ferrario-Pozzi pointed out that cases where the defendant did not receive adequate notice that a final order of forfeiture would be entered pose different concerns than cases where the defendant knew of this fact all along. See id. at 9. The efficiency of the court system's operations may have been hurt in this case, but Yeje-Cabrera was not.

As the Fifth Circuit held in Loe, 248 F.3d at 464, we find nothing objectionable about employing a later nunc pro tunc amendment to cure a mere failure of the judgment to describe a final order of forfeiture as required by Rule 32.2(b)(3). This is provided, of course, that the judge has properly addressed the forfeiture issue previously. See id. (trial judge had included

forfeiture at oral pronouncement of sentencing and had issued a preliminary written order of forfeiture); United States v. Hatcher, 323 F.3d 666, 673-74 (8th Cir. 2003) (deeming omission of the forfeiture from both the sentencing and the judgment to be mere clerical error, where the district court had earlier entered a preliminary forfeiture order).  Accordingly we order amendment of the judgment nunc pro tunc to include the final order of forfeiture.

**C. Sentencing Issues**

1. Defendants' Claims

a. Apprendi/Booker -- All Defendants

All three defendants challenge their sentences on the basis of a misunderstanding of Apprendi v. New Jersey, 530 U.S. 466 (2000), and Blakely v. Washington, 542 U.S. 296 (2004).  Each argues that it was error for the district court to impose a sentence on the basis of facts found by the court by a preponderance of the evidence, but not found by the jury beyond a reasonable doubt.  In Yeje-Cabrera's case, the alleged flaw was a sentence enhancement under U.S. Sentencing Guidelines Manual (U.S.S.G.) § 3B1.1 based on the court's finding that he was "the organizer, manager and leader of a large-scale drug organization including more than five individuals."  In Pérez's case, the jury stated in its special verdict form that Pérez was responsible for five kilograms of cocaine, but the district court found that Pérez

was responsible for a drug quantity between 15 and 50 kilograms. It also imposed a sentence enhancement under U.S.S.G. § 4B1.1, based on its finding that Pérez was a career offender.[7]  In Olivero's case, the claimed error arises from the district court's finding that Olivero was responsible for "at least 499 grams" of cocaine, when the jury verdict had attributed no particular drug quantity to Olivero.

These objections -- that the judge, not the jury, found certain facts -- misapprehend the law as it was eventually articulated in United States v. Booker, 125 S. Ct. 738 (2005).  As we explained in United States v. Antonakopoulos, 399 F.3d 68 (1st Cir. 2005), the Booker error "is not that a judge (by a

---

[7] It is not clear whether counsel for Pérez is also asserting that the base offense level of 37 was somehow inaccurate.  If so, the record refutes the argument easily.  The court found that Pérez was a "career offender, having had two prior convictions of either a crime of violence or [a] controlled substance violation."  See U.S.S.G. § 4B1.1(a).  Under U.S.S.G. § 4B1.1(b), the offense level provided by the career offender subsection or the otherwise applicable offense level, whichever is greater, must be applied. The table in that subsection provides that if the statutory maximum for the offense is life imprisonment, then the offense level is 37. Here, the statutory maximum was life, as provided by 21 U.S.C. § 846 (conspiracy to commit an offense is punished the same as the offense itself) and § 841(b)(1)(A)(ii) (distribution of five kilograms or more of cocaine subjects the offender to a maximum penalty of life in prison).  Therefore, the offense level was 37 under the career offender table, and this was greater than the otherwise applicable offense level of 34, so it was the correct level to apply under the career offender Guideline.  Under U.S.S.G. § 4B1.1(b), "[a] career offender's criminal history category in every case under this subsection shall be Category VI."  With a total offense level of 37 and a criminal history of Category VI, the Guidelines range was thirty years to life in prison.

preponderance of the evidence) determined facts under the Guidelines which increased a sentence beyond that authorized by the jury verdict or an admission by the defendant; the error is only that the judge did so in a mandatory Guidelines system." Id. at 75.

For this reason, we reject Olivero's argument that because the jury did not attribute a specific drug quantity to him, his sentence must be vacated.

Olivero argues in particular that, because there was no specific drug quantity found by the jury, the "statutory maximum" for him was that based on a Guidelines offense level of 12, pursuant to U.S.S.G. § 2D1.1(c)(14) (providing for a base offense level of 12 where the drug quantity is less than 25 grams of cocaine). With a base offense level of 12 and a criminal history category of I, the high end of the Guidelines range would have been 16 months. See United States v. Green, 346 F. Supp. 2d 259, 327 (D. Mass. 2004). But the actual statutory maximum here was 20 years. The district court's attribution to Olivero of a specific quantity of cocaine ("at least 499 grams") no more invalidates his sentence than it does his conviction. There was a period between Blakely and Booker when the district courts were forced to predict and improvise. Some courts, as the court did here, predicted wrongly that Sixth Amendment concerns required as a remedy that certain issues (for instance, drug quantity) be decided by a jury,

not a judge.  It is now well settled that this was wrong; the remedy was to make the Guidelines non-mandatory.  See Booker, 125 S. Ct. at 756-57; Antonakopoulos, 399 F.3d at 75.

Since Booker we have made it clear that the district courts may make drug quantity determinations for sentencing purposes:

> Under the 5-4 constitutional ruling in Booker, judge-made enhancements under the guidelines that result in a sentence greater than the sentence that could be imposed based solely on the facts found by the jury do amount to Sixth Amendment violations if the guidelines are treated as mandatory; but under the companion 5-4 remedial ruling in Booker, this problem is washed out by treating the guidelines as advisory.  A defendant sentenced under the mandatory regime may be entitled to resentencing under the advisory one . . . but Booker both created and cured the constitutional error at the same time.

United States v. Pérez-Ruiz, 421 F.3d 11, 14-15 (1st Cir. 2005) ("Pérez-Ruiz II").  We rejected the defendant's claim that "the district judge violated the Sixth Amendment by himself making the determinations as to drug quantity and other enhancements."  Id. at 14; see also United States v. Sanchez-Berrios, 424 F.3d 65, 80 (1st Cir. 2005) ("[A]n unadorned claim that the judge -- and not the jury -- found sentencing facts, even if true, does not warrant resentencing." (citing United States v. Martins, 413 F.3d 139, 152 (1st Cir. 2005))).  There was no reversible error in the district

court's attribution to Olivero of at least 25 grams of cocaine.[8]
That is a separate matter than the government's appeal from the
sentence, which we address below.

No defendant makes a plausible claim for a remand under
Booker and Antonakopoulos.  Yeje-Cabrera and Olivero never filed
briefs raising a Booker/Antonakopoulos argument, so they have
waived any claim they might have had under those decisions.  See
United States v. Vega Molina, 407 F.3d 511, 534 n.7 (1st Cir.
2005).

Pérez did file a supplemental brief seeking resentencing
under Booker, but he has not shown why resentencing is justified in
his case.  He concedes that plain error review applies.  We thus
apply the standard that we articulated in Antonakopoulos.  See
Antonakopoulos, 399 F.3d at 77.

---

[8] Olivero also challenges his sentence by claiming that the
district court abused its discretion when it imposed an upward
departure of seven months.  Under U.S.S.G. § 5K2.0, the sentencing
court may depart where there are aggravating or mitigating
circumstances "of a kind, or to a degree, not adequately taken into
consideration by the Sentencing Commission in formulating the
guidelines."  U.S.S.G. § 5K2.0(a)(1) (Policy Statement).  Olivero
argues that it was error to depart on the basis of his role in the
offense, because it was already adequately addressed under the
Guidelines.  It is clear, though, that the district court not only
could have, but would have, departed on the sole basis of the other
ground it cited: the extraordinary extent and danger of the
conspiracy.  Contrary to Olivero's assertion that it was just a
"run of the mill" conspiracy, the evidence at trial showed that
this conspiracy involved a multistate network of players,
sophisticated tactics, and record-setting quantities of cocaine.

Pérez has not met his burden of showing a "reasonable probability that the district court would impose a different sentence more favorable to the defendant under the new 'advisory Guidelines' Booker regime." Id. at 75. Pérez points to nothing in the record that would suggest that the district court would have sentenced him more leniently had it been free to do so. Instead, he asks this court to look outside the record -- for instance, he claims that the trial judge made public statements condemning the Guidelines in general as too harsh -- and he ultimately disclaims any attempt to make the requisite showing under Antonakopoulos, admitting that he "is not claiming, per se, that the sentencing court might have given him a more favorable sentence had [it] not been for the guidelines."

In fact, the court stated:

> There's no reason to depart downward in your case. You are a career offender. You've had all the chances the law allows. I have given you the bottom of the guidelines. Not that that amounts to much when it comes out to being a 30 year sentence.
>
> This is the sentence for dealing drugs in our society. It is the sentence decreed by the people's representatives sitting in congress. It is a fair and just sentence.

On these facts, a remand for resentencing is not warranted. See Sanchez-Berrios, 424 F.3d at 80 ("It is not enough for a defendant merely to argue that his sentence might have been different had the guidelines been advisory at the time of sentencing."); id. (stating

that the fact that defendant was sentenced at the bottom of the Guidelines range, "standing alone, is manifestly insufficient to satisfy the third element of the plain error test").

    b. The fine -- Pérez

Pérez challenges his $4 million fine on the ground that he is indigent and has no "potential ability" to pay the fine in the future, and so it was error for the court to impose it. Pérez did not challenge the fine in the district court, so we review for plain error. See United States v. Peppe, 80 F.3d 19, 22 (1st Cir. 1996).

Pérez never submitted financial information before sentencing.[9] At sentencing, the district court stated:

> The Court imposes upon you no fine due to your inability to pay a fine. I take that back. I take that back. The Court imposes upon you the maximum fine under the sentencing guidelines, $4 million. I don't think you have the capability of paying it, and you cannot be required or any sanction levied against you due to a genuine inability to pay. There's a great deal of money here and if the government can find any of it we'll have it applied to that fine. (emphasis added)

_____

[9] The presentence report for Pérez states that "[t]he defendant did not bring the requested financial information to the presentence interview. As of the date of the disclosure of this report, the defendant had not submitted a financial statement." It further states that the statutory maximum fine that could be imposed on Pérez, pursuant to 21 U.S.C. § 841(b)(1)(A), was $4 million, and that the Guidelines range, pursuant to U.S.S.G. § 5E1.2(c)(1) and (c)(4), was $20,000 to $4 million.

Pérez argues that since the court found an inability to pay, no fine should be imposed.

Guideline § 5E1.2(a) places the burden on the defendant to establish inability to pay a fine: "The court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." See also United States v. Savoie, 985 F.2d 612, 620 (1st Cir. 1993) ("[U]nder the guidelines, a fine is the rule -- and it is the defendant's burden to demonstrate that his case is an exception."). The showing required of the defendant is not only of present indigence, but also of future inability to pay: "To meet his burden, a defendant must establish that it is more likely than not that he is both unable to pay a fine and will not be able to pay in the future. . . . A present lack of assets or even a negative net worth will not preclude imposition of a fine unless a defendant also demonstrates that he lacks the ability to earn and to pay a fine in the future." United States v. Rowe, 268 F.3d 34, 38 (1st Cir. 2001) (citations omitted).

"Express findings about a defendant's financial condition are not necessary to support the imposition of a fine if the record is sufficient to permit appellate review. As long as the record evidence supports a fine, the district court is presumed to have

considered the applicable statutory criteria."  Id. at 39 (citations omitted).[10]

The record supports the district court's decision to impose the fine.  Pérez's "inability to pay does not follow inexorably from the facts in the record." Peppe, 80 F.3d at 23. Here, we understand the district court to have concluded that while Pérez might have no present ability to pay, he had not shown that he was not likely to become able to pay.  The court quite reasonably determined that Pérez might be or become in possession of some of the ill-gotten gains of the conspiracy.  Cf. United

_____

[10] Here, the criteria the court was to consider included:
> (1) the need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence;
> (2) any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources;
> (3) the burden that the fine places on the defendant and his dependents relative to alternative punishments;
>
> . . . and
> (8) any other pertinent equitable considerations.
>
> The amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive.

U.S.S.G. § 5E1.2(d).  The district court is directed to consider similar factors under 18 U.S.C. § 3572(a), including "the need to deprive the defendant of illegally obtained gains from the offense." Id. § 3572(a)(5).

-39-

States v. Lujan, 324 F.3d 27, 34 (1st Cir. 2003) (stating that "the district court must consider, among other things . . . the need to deprive the defendant of ill-gotten gains").

### 2. Government's Appeal from Olivero's Sentence

The government asks that Olivero's sentence be vacated and the matter be remanded for resentencing. First, the government argues that the district court erred in holding that Apprendi precluded it from finding a drug quantity above 499 grams (particularly in the face of evidence that Olivero was responsible for a considerably greater quantity of cocaine). Second, the government argues, the court erred in declining to follow the Guidelines in order to punish the prosecution for what the court considered to be impermissible fact bargaining. Specifically, the government takes issue with the court's decision to a) deny a firearms enhancement under U.S.S.G. § 2D1.1(b)(1), even though it found that the facts warranting the enhancement had been shown by a preponderance of the evidence, and b) grant a reduction in Olivero's offense level under § 3B1.2(a) for being a minimal participant, when it was clear that Olivero was not a minimal participant.

Olivero, a prime actor in the conspiracy, received only a 48-month sentence in the face of a statutory maximum of 20

years.[11]  The overall conspiracy involved possession with intent to distribute 260 kilograms of cocaine.

### a. How the Court Arrived at Olivero's Sentence

Olivero and 20 other defendants in this case were indicted on December 20, 2001.  Before trial, there was a flurry of plea bargaining activity: in all, 15 of the 21 defendants pled guilty, seven "on the very eve of trial."  Green, 346 F. Supp. 2d at 325.

On July 10, 2002, the probation office was asked to prepare a "pre-plea" presentence report for Olivero.  Evidently this judge of the district court orders such "pre-plea" presentence reports as a matter of course.  See id. at 279 ("This court has burdened an already strained probation office by ordering pre-plea presentence reports in virtually every case as the best defense to illegal fact bargaining.").  The "pre-plea" presentence report was prepared on October 29, 2002.  It discussed the possibility of a minimal-role reduction for Olivero, but rejected it as not warranted on the evidence.  It did not mention that Olivero had possessed a firearm.

_____

[11] Because the jury convicted Olivero of conspiracy to possess cocaine with intent to distribute, and because the conspiracy as a whole had been charged with responsibility for more than five kilograms of cocaine, the government originally argued in the district court that the statutory maximum applicable to Olivero was life imprisonment.  See 21 U.S.C. § 841(b)(1)(A).  It has dropped that argument on appeal, conceding that the "default 20-year statutory maximum" applies.

On October 14, 2002, the U.S. Attorney sent to Olivero's attorney the plea agreement that they had negotiated, and Olivero and his attorney signed the document on October 30, 2002. In the proposed agreement, there was no mention of a weapon or a weapons enhancement, and the government agreed not to oppose a minimal participant downward adjustment pursuant to U.S.S.G. § 3B1.2(a). At the time, the government was also negotiating agreements with a number of co-defendants.

The proposed deal fell through on November 1, 2002, just before trial was to begin on November 4. Olivero withdrew from the deal when, at the hearing on acceptance of the plea, the court informed him that a plea would likely result in his immediate remand to custody. Green, 346 F. Supp. 2d at 325. Olivero went to trial. Switching from its position during the plea agreement, the government presented evidence at trial tending to show that Olivero's role in the offense was more than minimal and connecting Olivero to a handgun whose ownership was in dispute. The jury returned its verdict, finding Olivero guilty, on December 12, 2002.

The post-conviction presentence report, dated April 10, 2003, states that a handgun was found in Olivero's bedroom, along with ammunition, 14.4 grams of cocaine, a scale, and a money-counting machine. Under U.S.S.G. § 2D1.1(b)(1), this meant a two-

level enhancement applied.[12]  The Probation Office took the position that an adjustment for minimal role in the offense was not warranted.

The court first found Olivero responsible for "at least 499 grams" of cocaine, which led to a base offense level of 24. The court explained that because the jury left Olivero's drug quantity space blank on its verdict form, the jury must have found that the prosecution failed to prove as to him a quantity of 500 grams or more beyond a reasonable doubt.  The court further stated that under Apprendi, a judge could not find a higher drug quantity on his own, by a mere preponderance of evidence.

Second, the court found that Olivero in fact possessed a gun in furtherance of the crime, but it declined to impose a sentence enhancement, citing what it viewed as the government's improper fact-bargaining, that is, an improper inconsistency between the government's willingness to ignore the gun enhancement as part of a plea agreement and its request for the gun enhancement after trial.  The district court emphasized that the "pre-plea" presentence report did not mention a firearm.  The court stated

---

[12] Under the Guidelines, if the defendant's offense involved possession of a dangerous weapon, his offense level is to be increased by two levels.  See U.S.S.G. § 2D1.1(b)(1).  Application Note 3 to this Guideline elaborates: "The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons.  The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense."

that the prosecution knew that a weapon had been found in Olivero's room "before the preplea was entered into," and rejected the prosecution's argument that the facts necessary to prove gun possession became clearer as the prosecution prepared for and ultimately conducted the trial.[13] As a result, the court punished the prosecution by refusing to enhance the sentence, even though the April 10, 2003 post-conviction presentence report had recommended the two-level U.S.S.G. § 2D1.1(b)(1) firearm enhancement.

Third, the court addressed Olivero's role in the offense. If a defendant is a "minimal" participant in criminal activity, his offense level is to be decreased by four levels. See U.S.S.G. § 3B1.2(a). If he is a "minor" participant, the reduction is two levels, and if his role is somewhere in between, the reduction is three levels. Id. § 3B1.2. The court awarded Olivero a 4-point minimal-role reduction. It found that the government had offered to recommend this reduction as part of the proposed plea agreement and, in the court's view, had engaged in improper fact-bargaining

---

[13] The government explained that once the intense period of plea bargaining was over and Olivero had rejected the plea, it had focused much more intently on the evidence it would present at trial. The government interviewed more witnesses and it became clearer to it that the weapon had been there, under Olivero's bed, not for other reasons, but in connection with the cocaine and drug proceeds in his closet.

by taking different positions.[14]  In essence, the court stated, the prosecution's change of position had burdened Olivero's right to insist on a jury trial.

Based on these calculations, Olivero's Guidelines sentencing range was 33 to 41 months.  The court departed upwards by seven months because Olivero was "in with these people" and not "some bit player" and because the conspiracy was extraordinarily extensive and dangerous -- facts it considered not sufficiently reflected in the Guidelines range.

The defendant had not advanced the arguments used by the district court to deny the gun enhancement or to grant the minimal participant downward departure.  From what we can tell of the record, Olivero did _not_ allege that the prosecution was retaliating against him for insisting on trial, much less offer any evidence in support of such a claim.  Instead, the court raised the fact-bargaining issue _sua_ _sponte_.  It also placed the initial burden on the prosecution to explain itself.[15]

_____

[14] The court's comments at sentencing did not make entirely clear whether it considered the minimal-role reduction issue to be one of fact bargaining.  The court's post-sentencing memorandum, however, suggests that that is indeed how the court viewed the matter.  See _Green_, 346 F. Supp. 2d at 330 (stating that government's denial that there was fact bargaining with respect to Olivero's role was "disingenuous").

[15] Olivero did object to the presentence report, claiming that the evidence supported a minimal role adjustment and that the government had earlier acknowledged as much.  He did not hint at any prosecutorial vindictiveness, emphasizing instead the evidence itself.  As for the gun, Olivero only objected on the basis that

On June 18, 2004, after the defendants had appealed their convictions and jurisdiction over their cases was in this court, the district court, sua sponte, published an 80-page advisory opinion (which it styled as a sentencing memorandum) in which it expanded upon its reasons for sanctioning the government. See Green, 346 F. Supp. 2d 259.

### b. Analysis of District Court's Rationale

### i. Apprendi

The district court post-Booker may determine drug quantity for purposes of sentence enhancements under the Guidelines. The district court's Apprendi rationale for limiting its consideration of drug quantity was simply a wrong guess as to the direction the law would take. The district court was not "constrained" by the jury's verdict, as it thought it was, to finding less than 500 grams of cocaine. Instead, it could (and should) have found Olivero responsible for the amount of cocaine established by a preponderance of the evidence against him -- though of course, the ultimate sentence may not exceed the

the weapon did not belong to him and that the evidence did not support the firearm enhancement, without mentioning the government's earlier position -- much less attributing any improper motive to the government. At sentencing, Olivero's attorney simply followed the court's lead, expressing agreement with the court's view that the government knew all along about the gun. The attorney then raised the prosecution's earlier support for the minimal role reduction, again failing to allege any sort of improper motive or vindictiveness.

statutory maximum of 20 years.  That alone is reason to vacate the sentence and to remand.

We go on to address the government's claims of Guidelines and statutory error.  See Antonakopoulos, 399 F.3d at 76.

### ii. Fact Bargaining

The district court offered three rationales for its reduction of Olivero's sentence as a punishment of the prosecution for "unconstitutional" or "illegal" fact bargaining.  The first rationale was that the defendant's right to trial by jury was impermissibly burdened by the government's change in position on the firearm enhancement and minimal role adjustment between plea bargaining and trial.  The second was that the punishment was justified because the government somehow deceived the court.  The third was that the Guidelines prohibited the government from doing what it did and the appropriate sanction was to give the defendant a lower sentence.

The court was attempting to address some aspects of the pre-Booker mandatory guidelines system which it considered particularly unfair and to address the power given to the prosecution by the Guidelines.  The court is also passionate about protecting the right to trial by jury.  That the court felt strongly is evidenced by the fact that it acted sua sponte: Olivero did not seek a reduction in his sentence on any of these grounds.

-47-

Booker's rendering of the Guidelines advisory (subject to restraints for reasonableness) may alleviate some of the concerns which motivated the court.  In this case, however, none of the district court's rationales justify the sentence it imposed.

(a) Fact Bargaining and the Right to a Jury Trial

The term "fact bargaining" has been used loosely to cover a variety of situations, from affirmative misrepresentations to a court to more benign agreements by counsel to base sentencing on other factors.  Fact bargaining may arise when there are different views of the facts, counsels' ability to prove them, and their consequences.  See, e.g., Sarner, "Fact Bargaining" Under the Sentencing Guidelines: The Role of the Probation Department, 8 Fed. Sent. R. 328, 1996 WL 671569, at *2 ("Counsel for both sides must assess their prospects for success before a jury, based on a wide variety of conflicting factors that develop during the government's investigation and as available defenses.  That the truth appears somewhere in between, after the dust has settled, is a world view shared by most criminal practitioners. . . . The basic assumption behind plea and fact bargaining is that criminal conduct, like human behavior in other contexts, is never black and white.").

Many of the district court's objections are to the inevitable artifacts and consequences of plea bargains.  Those consequences have been accepted as beneficial to society and raise no constitutional concerns.  Plea bargaining is an essential part

of our criminal justice system and is "a highly desirable part for many reasons." Santobello v. New York, 404 U.S. 257, 261 (1971); accord Blackledge v. Allison, 431 U.S. 63, 71 (1977). Plea bargaining takes place between the prosecution and the defense, and does not involve the court.

There are very few rules imposed on the prosecution as to plea bargaining with the defense, save that it may not coerce a plea. For example, Rule 11(c) of the Federal Rules of Criminal Procedure, which governs "Plea Agreement Procedure," "says next to nothing on how plea negotiations are to be carried out" and "does not reach the question of what the attorney for the government and the attorney for the defendant can say to each other." 1A C. Wright, Federal Practice and Procedure § 175.1 (3d ed. 1999) (discussing former Rule 11(e), predecessor to Rule 11(c)).

While the government may not coerce a defendant into an involuntary plea, the government has a wide latitude in how it reaches a plea.[16] See id. For example, the prosecutor may insist, as a condition of a plea, that the defendant waive all appellate

---

[16] The government also has wide latitude in investigating and prosecuting crimes. Cf. United States v. Bezanson-Perkins, 390 F.3d 34, 36 (1st Cir. 2004) (in context of defendant's challenge to his conditional guilty plea, rejecting theory that "a defendant who has given a valid Miranda waiver may seek to suppress his later voluntary and uncoerced statements to the police on the grounds that (arguably) misleading statements by the police invalidated his Miranda waiver"); United States v. Byram, 145 F.3d 405, 408 (1st Cir. 1998) (with respect to obtaining confessions, "trickery is not automatically coercion").

rights.  See United States v. Teeter, 257 F.3d 14, 21-23 (1st Cir. 2001).  The prosecution may insist on a waiver of rights under Brady v. Maryland, 373 U.S. 83 (1963).  Under some circumstances, the prosecution may refuse to disclose certain kinds of exculpatory material to the defendant in the course of plea bargaining.  See United States v. Ruiz, 536 U.S. 622, 633 (2002).  And if the negotiations are not successful, due process is not violated if the prosecutor carries out threats made during the negotiations that the defendant will be reindicted on a more serious charge which will bring higher penalties.  Bordenkircher v. Hayes, 434 U.S. 357, 365 (1978).

Defendants who plead guilty will receive a benefit in sentencing over those who do not, in both charge bargaining and fact bargaining situations.  Because they benefit, they neither have any constitutional claim nor have any interest in asserting a claim that their agreement is unconstitutional, unless the plea is involuntary.[17]  See id. at 363 ("Plea bargaining flows from 'the

---

[17] Commentators have raised as a possible infirmity of fact bargaining that a defendant would receive an unduly lenient sentence because the government did not fully disclose the facts. Such circumstances, of course, benefit defendants, so there is no concern about intrusion on a defendant's constitutional rights. See generally Bowman, To Tell the Truth: The Problem of Prosecutorial "Manipulation" of Sentencing Facts, 8 Fed. Sent. R. 324, 1996 WL 671568, at *2; Weinstein, Fifteen Years after the Federal Sentencing Revolution: How Mandatory Minimums Have Undermined Effective and Just Narcotics Sentencing, 40 Am. Crim. L. Rev. 87, 120 (2003).  There is an institutional concern, and it is said to stem from the ethical requirement that counsel not mislead the courts and from the Sentencing Guidelines themselves.  See

mutuality of advantage' to defendants and prosecutors, each with his own reasons for wanting to avoid trial." (quoting Brady v. United States, 397 U.S. 742, 752 (1970))).

The fact that the defendant who pleads gets a benefit over those who go to trial and are convicted is a necessary artifact of any plea bargaining regime. The law long ago determined there was nothing unconstitutional or illegal about any "burden on trial rights" caused by such a differential. "While confronting a defendant with the risk of more severe punishment clearly may have a 'discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices [is] an inevitable' -- and permissible -- 'attribute of any legitimate system which tolerates and encourages the negotiation of pleas.'" Id. at 364 (quoting Chaffin v. Stynchcombe, 412 U.S. 17, 31 (1973)). The Supreme Court has "unequivocally recognize[d] the constitutional propriety of extending leniency in exchange for a plea of guilty and of not extending leniency to those who have not demonstrated those attributes on which leniency is based." Corbitt v. New Jersey, 439 U.S. 212, 224 (1978); see also id. at 223 ("There is no doubt that those homicide defendants who are willing

---

generally Klein, Due Process Denied: Judicial Coercion in the Plea Bargaining Process, 32 Hofstra L. Rev. 1349, 1384 (2004); Nagel, Foreword -- Structuring Sentencing Discretion: The New Federal Sentencing Guidelines, 80 J. Crim. L. & Criminology 883, 935-37 (1990); Schulhofer & Nagel, Plea Negotiations Under the Federal Sentencing Guidelines: Guideline Circumvention and its Dynamics in the Post-Mistretta Period, 91 Nw. U. L. Rev. 1284 (1997).

to plead non vult may be treated more leniently than those who go to trial, but withholding the possibility of leniency from the latter cannot be equated with impermissible punishment as long as our cases sustaining plea bargaining remain undisturbed."). "[A]fter trial, the factors that may have indicated leniency as consideration for the guilty plea are no longer present." Alabama v. Smith, 490 U.S. 794, 801 (1989) (citing Brady, 397 U.S. at 752). It is clear that "[t]he fact that those who plead generally receive more lenient treatment, or at least a government recommendation of more lenient treatment than co-defendants who go to trial, does not in and of itself constitute an unconstitutional burden on one's right to go to trial and prove [one's] case." United States v. Rodriguez, 162 F.3d 135, 152 (1st Cir. 1998).

There is a different concern, of constitutional dimension, that the government not act vindictively in retaliation against the exercise of rights by a defendant. See North Carolina v. Pearce, 395 U.S. 711, 725 (1969). But the Pearce line of decisions deals with circumstances different from Olivero's case and arises in the context of 1) resentencing in a second trial after the defendant has obtained a new trial by appeal or collateral attack or 2) resentencing after the defendant has successfully withdrawn a guilty plea. See Pearce, 395 U.S. at 725 ("Due process of law, then, requires that vindictiveness against a defendant for having successfully attacked his first conviction

-52-

must play no part in the sentence he receives after a new trial.");
Smith, 490 U.S. at 795.

The Supreme Court has said that how the government acts during plea bargaining raises no vindictiveness concerns, but only concerns of whether the plea was voluntary.[18] Indeed, in Bordenkircher, the Court held that the due process concerns expressed in the Pearce line of cases about punishment or retaliation are simply not present in a plea bargaining situation. "[I]n the 'give-and-take' of plea bargaining, there is no such element of punishment or retaliation so long as the accused is free to accept or reject the prosecution's offer." 434 U.S. at 363. Here, the defendant withdrew from the plea agreement, so the knowing and voluntary test under Boykin v. Alabama, 395 U.S. 238, 242 (1969), does not come into play.[19]

---

[18] While Bordenkircher involved imposition of a greater charge and not a greater sentence recommendation on the defendant's rejection of the plea agreement, the Supreme Court said that the higher charge was functionally equivalent to a sentencing recommendation scenario. See Bordenkircher, 434 U.S. at 363 ("Indeed, acceptance of the basic legitimacy of plea bargaining necessarily implies rejection of any notion that a guilty plea is involuntary in a constitutional sense simply because it is the end result of the bargaining process. By hypothesis, the plea may have been induced by promises of a recommendation of a lenient sentence or a reduction of charges, and thus by fear of the possibility of a greater penalty upon conviction after a trial.").

[19] Even when a guilty plea is at issue, this court has rejected arguments that pressure to enter a plea is sufficient to render the plea involuntary. See, e.g., United States v. Mescual-Cruz, 387 F.3d 1, 7 (1st Cir. 2004) (stating with respect to package plea arrangements, where "the prosecutor offers a benefit or detriment to all (the defendant and third parties) in order to persuade the

Even assuming there is, post-<u>Bordenkircher</u>, some role for a vindictiveness analysis in this situation, <u>see</u> <u>United States</u> v. <u>Goodwin</u>, 457 U.S. 368, 380 n.12, 384 (1982); <u>Smith</u>, 490 U.S. at 802-03, the concern is with prosecutorial vindictiveness, not with the possibility that defendants face some burden on the right to trial in the form of a risk of a higher sentence.  <u>See</u> <u>Blackledge</u> v. <u>Perry</u>, 417 U.S. 21, 27-28 (1974); <u>cf.</u> <u>Johnson</u> v. <u>Vose</u>, 927 F.2d 10 (1st Cir. 1991).  The district court focused on burden on a defendant's trial rights and did not find vindictiveness.  Indeed, there was no basis for a conclusion either that Olivero's rights to trial were burdened or that he was the subject of vindictiveness.[20]

---

entire group of defendants to plead guilty," that there is a risk that "there may be a family relationship between two defendants which leads one defendant to involuntarily sacrifice his own best interests for those of a family member (or perhaps both family members to involuntarily sacrifice themselves) in a belief that the package deal will benefit the other"); <u>id.</u> at 7-8 ("As to this . . . risk, there is a distinction to be drawn.  The concern of the law is for voluntariness.  'If a defendant elects to sacrifice himself [to protect someone close to him] that is his choice, and he cannot reverse it after he is dissatisfied with his sentence, or with other subsequent developments.'" (quoting <u>United States</u> v. <u>Buckley</u>, 847 F.2d 991, 1000 n.6 (1st Cir. 1988))); <u>see also</u> <u>Buckley</u>, 847 F.2d at 1000 n.6 (rejecting argument that where the government "promises lenient treatment of a pleading defendant's family member," the plea bargain is <u>per se</u> substantively unfair).

[20] In <u>Goodwin</u>, additional charges were brought after the defendant rejected a guilty plea and demanded a jury trial. <u>Goodwin</u>, 457 U.S. at 370-71.  The Supreme Court's rationale for rejecting a presumption of vindictiveness in that case is equally applicable in this context:

> There is good reason to be cautious before adopting an inflexible presumption of prosecutorial vindictiveness in a pretrial setting.  In the course of preparing a case

A defendant simply has no right to a sentence, after trial, that is as lenient as a sentence he could have had earlier in a plea bargain. See United States v. McMillian, 583 F.2d 1061, 1063 (8th Cir. 1978) ("Appellant's claim, is, in essence, that a trial court is bound by the most favorable offer as to sentence made by the prosecutor during the course of plea negotiations, regardless of whether that offer is accepted or rejected by the defendant. This claim is fatuous.").

(b) Deception of the Court

The district court had a separate set of concerns -- that the prosecution provide it with accurate information for sentencing purposes, both during the hearing on the plea and at sentencing after the trial. The court was disturbed because during the plea

---

for trial, the prosecutor may uncover additional information that suggests a basis for further prosecution or he simply may come to realize that information possessed by the State has a broader significance. At this stage of the proceedings, the prosecutor's assessment of the proper extent of prosecution may not have crystallized. In contrast, once a trial begins -- and certainly by the time a conviction has been obtained -- it is much more likely that the State has discovered and assessed all of the information against an accused and has made a determination, on the basis of that information, of the extent to which he should be prosecuted. Thus, a change in the charging decision made after an initial trial is completed is much more likely to be improperly motivated than is a pretrial decision.

Id. at 381.

bargaining process no mention was made to it or to the probation office of the firearm in Olivero's bedroom.[21]  Of course, it was both the prosecution and the defense which kept silent.

The district court felt its position was justified by the Guidelines Policy Statement on Stipulations set forth at § 6B1.4, which provides:

> (a) A plea agreement may be accompanied by a written stipulation of facts relevant to sentencing.  Except to the extent that a party may be privileged not to disclose certain information, stipulations shall:
> (1) set forth the relevant facts and circumstances of the actual offense conduct and offender characteristics;
> (2) not contain misleading facts; and
> (3) set forth with meaningful specificity the reasons why the sentencing range resulting from the proposed agreement is appropriate.

U.S.S.G. § 6B1.4; see also Green, 346 F. Supp. 2d at 278 n.69 (citing U.S.S.G. § 6B1.4(a)(2) & cmt.); id. at 328 n. 363 (same).

It is likely that the policy statements in Chapter Six of the Guidelines Manual, like those in Chapter Seven, are advisory, not mandatory.  See Ellis v. U.S. Dist. Court (In re Ellis), 356 F.3d 1198, 1214-15 (9th Cir. 2004) (en banc) (Kozinski, J., concurring) (arguing that the policy statements in Chapter Six of

_____

[21] The minimal-role reduction issue was qualitatively different.  There was no lack of notice to the court or the probation office.  The probation office itself had sufficient information to conclude in its pre-plea PSR that a minimal role adjustment was unwarranted.  The court had this information before it at both the plea and the sentencing stages.

the Guidelines Manual are only "hortatory," in part because Chapter Six, like Chapter Seven, "is made up entirely of policy statements and their commentary" and "contains no guidelines"); United States v. O'Neil, 11 F.3d 292, 301 n.11 (1st Cir. 1993) ("[W]e today join six other circuits in recognizing Chapter 7 policy statements as advisory rather than mandatory."). Treating the policy statement as advisory recognizes the difficulty of enforcement of any such rule. In any event, the policy statement provides no justification for a court to sentence a defendant on any basis other than the facts before it, much less does it provide a justification for a court to disregard the facts before it as a "remedy" for the government's earlier failure to provide all the facts.

The proposition, implicit in the court's view, that sentencing would be better if there were utter candor and complete disclosure as to all points by the prosecution is itself problematic. Counsel should not affirmatively misstate the material facts at sentencing. See United States v. Casas, 425 F.3d 23, 2005 U.S. App. LEXIS 21960, at *35-41 (1st Cir. 2005). Still, there is a line, admittedly ambiguous, between an affirmative misrepresentation of facts presented at sentencing and how prosecutors (and defendants) handle unclear or less provable facts. See Gardner & Rifkind, A Basic Guide to Plea Bargaining Under the Federal Sentencing Guidelines, 7 Crim. Just. 14, 16 (Summer 1992) ("The stipulation cannot contain misleading facts. . . . Where

facts are unclear or unascertainable, the parties may agree on some form of them without further justification or explanation to the court." (citation omitted) (citing U.S.S.G. § 6B1.4(a)(2))).

Even if the prosecutor knew and could prove a gun enhancement at the time of the plea bargain, that fact would not make a difference to our analysis. No misrepresentation was made; rather, there was an omission, helpful to the defendant, which was an implicit part of the bargain. Rule 11(c)(1)(B) expressly contemplates that the attorney for the government can agree with the defendant's request that a sentencing factor does or does not apply, though this is not binding on the court. See Fed. R. Crim. P. 11(c)(1)(B). It was under that rule that Olivero's plea was tendered. If the defendant and the government have agreed on a sentence free of a possible enhancement, there is a significant question as to why they should be burdened with an obligation to disclose the evidence supporting the enhancement at a plea hearing. The obligation imposed by the Rule is to "disclose the plea agreement." Fed. R. Crim. P. 11(c)(2).

A system of mandatory disclosure of all possible information at a plea hearing would not usually help defendants. Moreover, the costs of monitoring compliance with such a mandatory disclosure system are high, and many of the efficiencies created by plea bargaining would be lost. It would also lead to the blurring of roles. After all, the federal rules prohibit involvement by a

trial judge in plea bargaining. This is true whether through the front door or the back. See Fed. R. Crim. P. 11(c)(1) ("An attorney for the government and the defendant's attorney . . . may discuss and reach a plea agreement. The court must not participate in these discussions."); cf. 1A C. Wright, Federal Practice and Procedure § 175.1 (3d ed. 1999) ("That the defendant has accepted a bargain proposed by the prosecutor creates no constitutional right to have the bargain specifically enforced. 'A plea bargain standing alone is without constitutional significance . . . .'" (quoting Mabry v. Johnson, 467 U.S. 504, 507-08 (1984))). In short, what happened here involved the artifacts of a system which is well accepted. While Congress and the Supreme Court could have chosen to structure matters differently, they have not.

The district court was correct to condemn any deception of the court.[22] But here, no claim of deception of the court is possible. The court, at the time of sentencing, did have all the facts before it on which to impose a sentence, and Olivero had fair

---

[22] In rare instances, the doctrine of fraud on the court will warrant remedial action. See Herring v. United States, 424 F.3d 384, 386-87 (3d Cir. 2005) ("[A] determination of fraud on the court may be justified only by 'the most egregious misconduct directed to the court itself,' and . . . it 'must be supported by clear, unequivocal and convincing evidence.'" (quoting In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions, 538 F.2d 180, 195 (8th Cir. 1976))); Geo. P. Reintjes Co. v. Riley Stoker Corp., 71 F.3d 44, 48 (1st Cir. 1995) (stating that the "fraud cognizable to maintain an untimely independent attack upon a valid and final judgment has long been regarded as requiring more than common law fraud").

notice of the issues. The prosecution had put on evidence at trial showing Olivero's ownership of the gun; Olivero in turn had pointed the finger at another defendant. The evidence was reviewed in the post-conviction presentence report, with Olivero objecting to the suggestion that he owned the gun and the probation office defending its stance. At sentencing, ownership of the gun was discussed yet again. The same abundance of evidence and debate characterized the issue of Olivero's role in the offense, culminating in the court's conclusion that Olivero was assuredly not "some bit player" or "casual hanger-on," but rather was "in with these people." There can be no suggestion that at the time of sentencing, the government was deceiving the court by hiding evidence of any sort, whether inculpatory or exculpatory.[23] The prosecution does not argue that it has a right to lie to a court and it did not do so here.

(c) Fact Bargaining and Other Provisions of the
   Guidelines

The court also referred to other provisions of the Guidelines themselves as imposing an obligation on the government to disclose all information at the stage a court is considering a plea and not to change its position thereafter. This misreads the

---

[23] There is an obligation imposed on the district courts to sentence based on all information in the record which is not false or materially incorrect. See United States v. Tavano, 12 F.3d 301, 305 (1st Cir. 1993). As Tavano noted, the Federal Rules of Criminal Procedure are designed to procure such information. Id. There is no possible argument here that there was a violation of those rules.

Guidelines.  One argument from the Sentencing Guidelines is that § 1B1.3 ("Relevant Conduct") specifies that the base offense level and adjustments be based on "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" and "all harm that resulted from" those acts.  U.S.S.G. § 1B1.3(a)(1)(A), (3).  There is no claim that the government did not provide such information at sentencing.  Ironically, the district court sanctioned the government because it did advance exactly such evidence of relevant conduct at sentencing.  By its terms, U.S.S.G. § 1B1.3 concerns what the court should do with the information before it at sentencing and does not create a set of sanctions against the government.

The other Guidelines concern arises from Application Note 1 to U.S.S.G. § 1B1.8 ("Use of Certain Information"), which simply makes it clear that that particular Guideline does not authorize the government to withhold information from the court.  In any case, there is no evidence here that Olivero provided self-incriminating information that the prosecution withheld from the court, so § 1B1.8 is inapplicable.

(d) Summary

The prosecution's conduct here transgressed no norm, constitutional or legal.  There was no cause to punish the prosecution at all.  We defer until some other case the question of

whether a district court may ever reduce a defendant's sentence as a sanction against the government for its conduct in earlier negotiating a plea which is not accepted. But we do note that the sentencing objectives set by the statute, 18 U.S.C. § 3553(a)(2), refer to punishment of the offender, deterrence of crime, protection of the public, and rehabilitation.

The sentencing of Olivero is vacated and the matter is remanded to the district court. Olivero thus will be resentenced in a post-Booker regime in which the Guidelines are no longer mandatory. We have reversed each of the rationales relied on by the district court, in the government's sentencing appeal, as a matter of law. This means that any reliance upon them at resentencing would be inherently unreasonable. See Booker, 125 S. Ct. at 765-66.

### III. Conclusion

The convictions of all three defendants are **affirmed**. The judgment in Yeje-Cabrera's case as to forfeiture is **ordered to be amended** as described in this opinion and his sentence is otherwise **affirmed**. Pérez's sentence is **affirmed**. Olivero's sentence is **vacated** and his case is **remanded** to the district court for resentencing consistent with this opinion.